## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| **DIAMONIK HOUGH; KATHARINE** | : | |
| **MILLER; CHRISTINA SORENSON;** | : | |
| **KELSEY ROMANO; CHRISTOPHER** | : | |
| **ROMANO; MAXWELL HIBBARD;** | : | |
| **ILSHIM PEARLMAN; MARK TYLER;** | : | |
| **DAMONE JONES, SR.; ABBEY** | : | |
| **TENNIS; HANNAH GALLO; JESSICA** | : | |
| **ROSENBERG; ZACHARY BORZONE;** | : | |
| **SARAH BOUAYAD; F.B., A MINOR BY** | : | |
| **AND THROUGH HIS GUARDIAN,** | : | |
| **CHRISTINE BURTON; SASHA** | : | |
| **BURTON; HEIDI CANNON; JORDAN** | : | |
| **CARRICK; JUSTIN CURTIS; VIOLET** | : | |
| **CUTLER; AMANDA DAMRON;** | : | |
| **GABRIEL ELSHEAKH; DANIEL** | : | |
| **FEDER; HEATHER GETTIS; EZRA** | : | |
| **GHIZZONE; LEO HABBS; SAVANNAH** | : | |
| **HAMILTON; ALESSANDRA** | : | |
| **HANKINSON; JAMILA HANKINSON;** | : | **CIVIL ACTION** |
| **SUSAN HANKINSON; AHMAD** | : | |
| **HANKINSON; BLAKE HASTINGS;** | : | **No. 20-_____** |
| **SAMANTHA HETH; TSARINA ISLAM;** | : | |
| **IVAN JUAREZ; SOPHIA KHAN; ADAM** | : | **JURY TRIAL DEMANDED** |
| **KNAPP; JOSEPH KOEHLER; ANDRE** | : | |
| **BULLOCK; GLORIA HOSTEN;** | : | |
| **ALLEGRA KING; DARRYL** | : | |
| **MCMILLIAN; BETTY RUDD;** | : | |
| **SABRINA RUDD; GREGORY** | : | |
| **SPEARMAN; SYLVIA TOWNS;** | : | |
| **VAUGHN TOWNS; TIMOTHY TYLER;** | : | |
| **ERIC WHITE; BERNARD LAMBERT;** | : | |
| **JUSTINA LEDONNE; NATHANIEL** | : | |
| **MILLER; JOE PIETTE; ELIJAH** | : | |
| **BLANTON; DELANEY KEEFE;** | : | |
| **SHAWN LYNCH; BRIAN** | : | |
| **MCCAFFERY; ALLISON RUFFNER;** | : | |
| **MINH TRAN; SKYLAR WATKINS;** | : | |
| **AMBER WRIGHT; PATRICK WARGO;** | : | |
| **JACOB PARENTE; BRYAN ORTIZ;** | : | |
| **CHRISTOPHER MCDANIEL;** | : | |
| **SEBASTIAN LOPEZ; ANDREW** | : | |

**POWERS; KAIRTLYN RAFFERTY;**                                :
**JONATHAN SALTLOW; MALLORY**                               :
**SCHNEIDER; ERIN SCHENKENBACH;**                          :
**ELIAS SELL; WALTER SMOLAREK;**                            :
**GWEN SNYDER; MATTHEW**                                     :
**SULLIVAN; SEAN WELCH; CALLUM**                            :
**WILSON; SEAMUS WILSON; ROBERT**                          :
**ZOLITOR; MAHEEN SHAFI; EMILY**                            :
**QUAST; CEA FORTAREZZO ORTIZ;**
**BRADFORD PULLEY; KYLAR**                                   :
**WATKINS; TAYLOR BROWN;**                                   :
**SHANNON ROCHE; JOSHUA**                                    :
**WALKER; GABRIELLE**                                        :
**EISENHOWER; JONATHAN SATLOW;**                           :
**MEGAN OᴇHLBECK; CRYSTAL**                                  :
**MCBEE; LEO HABBS,**                                        :
                                                             :
                                                             :
        **Plaintiffs,**    :
                                                             :
    **v.**                                 :
                                                             :
**CITY OF PHILADELPHIA; JAMES**                             :
**KENNEY; DANIELLE OUTLAW;**                                :
**DENNIS WILSON; RICHARD**                                  :
**NICOLETTI JR.; JANE/JOHN DOES 1-**                       :
**100,**                                                     :
                                                             :
                                                             :
       **Defendants.**        :
                                                             :
                                                             :

---

## COMPLAINT

## I.    PRELIMINARY STATEMENT

1.    On May 31, 2020 and June 1, 2020, officials who hold some of the City of

Philadelphia's highest-level positions ordered and directed extraordinary abuses of police power

against peaceable protesters and uninvolved Philadelphia residents. Many of the victims of these

unprovoked acts of aggression and violence by the Philadelphia Police Department were engaged in a peaceable demonstration and police observation in the area of 51st and Chestnut Streets in Philadelphia and in a massive and peaceable demonstration on the Vine Street Expressway. Following the orders of City of Philadelphia officials, Philadelphia police officers fired chemical weapon canisters and ostensible "less-lethal" projectiles in unwarranted and ill-advised efforts to clear a mostly residential neighborhood in West Philadelphia and an area in which victims had limited pathways of escape on the Vine Street Expressway. At no time were the actions of law enforcement officers justified.  Their actions were grossly excessive and caused unnecessary physical and emotional injury to the peaceable protesters, observers, and residents.

2.      Free speech, as embodied by the First Amendment to the United States Constitution, is a cornerstone of our constitutional democracy. The First Amendment is the people's protection against the government infringing upon the free expression of ideas – particularly dissenting ideas.  Born out of the struggle against tyranny more than two centuries ago, the First Amendment embodies the heart and soul of our democracy: the right to speak freely, to assemble in protest, and to express shared ideas through a collective public voice.  Those voices often express unpopular, dissenting views. Drafted in 1787, the First Amendment states:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

3.      Without this protection, freedom cannot survive. In ensuring that the right to political protest is protected under the First Amendment, we have long recognized the right to free expression and association, which includes occupying public spaces in order to protest, demonstrate, march, and openly express opinions on political matters of public concern. The burgeoning Black Lives Matter movement is an essential part of the continuing struggle for racial

equality and social justice. This lawsuit seeks to vindicate the rights of those whose rights were violated during the protests against the historic, racist brutality of the Philadelphia Police Department.

## II. BACKGROUND

### A.   History of Misconduct by the Philadelphia Police Department

4.   The brutality of the Philadelphia Police Department against African Americans is an infamous part of the historical landscape of the City of Philadelphia.[1] The murder of George Floyd was the metaphorical straw that broke the camel's back and sparked the latest set of international protests and political debate over racial injustice. However, during the last decade in Philadelphia, Black people have been killed by police at an alarming rate. Dennis Plowden Jr., Tyreas Carlyle, Jamil Moses, David Jones, Hassan Pratt, Albert Purnell, Bryan Jones, and Brandon Tate Brown are the names of just a few of the young Black men killed by Philadelphia police officers in the past several years.

5.   The Philadelphia Police Department's culture of systemic misconduct, brutality, and racism has been the subject of inquiries by journalists, government commissions, and human rights advocates for decades. During the 1960s and 1970s, while Frank Rizzo served as Police Commissioner and then Mayor, the Philadelphia Police Department was infamous for the extreme police brutality officers leveled against the residents of the City.

6.   Between the years of 1970 and 1978, the Philadelphia Police Department, on average, shot one civilian per week. This statistic exemplifies Frank Rizzo's legacy of unchecked

---

[1] Saint, D., McCoy, C., Rowan, T. and Russ, V., 2020. Black And Blue: 190 Years Of Police Brutality Against Black People In Philadelphia. [online] https://www.inquirer.com. Available at: <https://www.inquirer.com/news/inq/philadelphia-police-brutality-history-frank-rizzo-20200710.html> [Accessed 12 July 2020].

police brutality.

7.     In 1979, the United States Department of Justice filed a civil rights suit against the

Philadelphia Police Department for systemic misconduct and brutality. In 1981, the United States

Commission on Civil Rights recounted the failure of the Philadelphia Police Department to

effectively address the pattern of misconduct. In 1998, seventeen years later, Human Rights Watch

reported on the same pattern of misconduct:

> "Philadelphia's police are grappling with the latest of the
> corruption and brutality scandals that have earned them one
> of the worst reputations of big city police departments in
> the United States. The persistence and regularity of the
> cycles indicate that between the front-page news stories the
> city and its police force are failing to act to hold police
> accountable. The result is an undisturbed culture of
> impunity that surfaces and is renewed with each successive
> scandal, as each new generation of police officers is taught
> through example that their leadership accepts corruption
> and excessive force."[2]

8.     The Philadelphia Police Department, historically, has disregarded civil rights. In

addition to Fourth Amendment protections, the Philadelphia Police Department has also infringed

upon citizens' rights to free speech and peaceable assembly. The Philadelphia Police Department,

like many police departments across the country, engaged in operations to spy on progressive

political movements – treating those groups as if they were terrorist organizations. An integral part

of this legacy of brutality by the Philadelphia Police Department is the decades-old effort to

undermine the right to free speech, association, and assembly.  In 1967, one of the Philadelphia

Police Departments' most notable attempts to quell free speech occurred when then-police official

Frank Rizzo ordered a brutal attack on students who were protesting racist policies in the

---

[2]  SHIELDED FROM JUSTICE: Police Brutality and Accountability in the United States, Human Rights Watch
1998 p.499)  https://www.hrw.org/reports/pdfs/u/us/uspol986.pdf

Philadelphia public school system.  While student protesters gathered at the headquarters of the School Board of Philadelphia, Frank Rizzo ordered police to end the peaceable protest by using force.

9.      During the mid-1970s, the MOVE organization, a back to nature progressive group living in West Philadelphia, engaged in protests against racism and brutality by the police department.  As the result of the MOVE organization's continued protests against police brutality in the African-American community, the Philadelphia Police Department began a campaign of harassment, intimidation, and assault. In 1977, under the direction of Mayor Rizzo, the Philadelphia Police Department erected a barricade around the MOVE headquarters. After a fifteen- month siege, police attacked the MOVE home with a military-style assault. Police officers fired thousands of rounds of ammunition into the home. A police officer was killed. Following the arrests of all of the residents, one of the MOVE members, Delbert Africa, was almost killed as the result of being beaten by Philadelphia police officers. The beating was captured by a local news crew and broadcast around the world, solidifying the reputation of the Philadelphia Police Department as one of the most violent and brutal police forces in the United States.

10.      In 1985, the Philadelphia Police Department attacked the MOVE organization a second time.  In one of the most infamous police attacks on civilians in history of this country, the Philadelphia Police fired more than 10,000 rounds of ammunition before dropping a military-grade explosive on the MOVE row home in West Philadelphia. Eleven people were killed, including five children. Sixty-two homes were burned to the ground. No police officers were ever charged with a crime related to that incident.

11.      In 2003, the Ceisler Report was issued. The report outlined the failure of the Philadelphia Police Department to discipline officers guilty of misconduct. Despite reports and

calls for reform, the cycle of police sanctioned violence remains unchanged.

12.     The origin of this current "culture of brutality" is rooted in the militarization of local police forces throughout this country. It is no coincidence that the "War on Crime," initiated under the Johnson administration in the mid-1960s and expanded by the Nixon administration in the late 1960s and early 1970s, was at its core, a war on civil liberties. With vast federal resources pouring into urban police forces throughout the country, the militarization of police departments was the political response to burgeoning movements for racial justice. Similarly, the "War on Drugs," expanded the scope of attacks during the Reagan, H. W. Bush, and Clinton administrations, creating a perpetual and decades-long war with devastating consequences for impoverished communities.  With the infusion of federal money and the mandate to militarize, the traditional policing functions expanded from solving crimes to preventing future criminal conduct.

13.     That dominant right-wing political atmosphere led to a law enforcement approach in which police officers perceived the expansion of civil rights as a threat to the power structure and, therefore, a threat to national security. The process of criminalizing dissent was backlash against civil rights and an attempt by police officers to use expanding police power to maintain the status quo.

14.     The War on Crime and the War on Drugs, as noted above, provided the impetus for local law enforcement to enter into community neighborhoods as though police officers were an occupying force.

15.     Police began employing aggressive forms of "law enforcement." The proliferation of SWAT teams across the country and their paramilitary tactics spread a violent form of policing that was designed for the extraordinary circumstances. SWAT was an elite force reserved for uniquely dangerous incidents, such as active shooters, hostage situations, or large-scale

7

disturbances.[3] However, in recent decades, these extreme tactics have become ordinary. When the concept of SWAT arose out of the Philadelphia[4] and Los Angeles Police[5] Departments, it was quickly picked up by big city police officials nationwide.

16.     In 1990, Congress authorized the Defense Department to transfer surplus weapons and vehicles, free of charge, to local police departments throughout the country. The weapons were provided to police departments, without any training, to continue this unending "War on Drugs." In 1997, Congress expanded authorized the use of these weapons of war to include "counterterrorism." According to the Defense Department, state and local police departments have received more than $4.3 billion worth of military hardware since the program's inception.[6]

17.     In 2011, a report by investigative reporters revealed that police departments throughout this country have used $34 billion in grant funding from the Department of Homeland Security.[7]

18.     In 2014, it was reported that the Commonwealth of Pennsylvania had received 34,000 pieces of military equipment, which were acquired over twenty years. Almost 2,000 of these weapons of war were classified as tactical equipment, tanks, mine-resistant vehicles, and automatic weapons. The records show that the Philadelphia Police Department received an

---

[3] The use of SWAT teams on May 31st and June 1, 2020 are direct manifestations of this aggressive and dangerous military style approach toward policing in this City.

[4] PhillyPolice Blog. 2012. Phillypolice Unit Profile: Special Weapons And Tactics (SWAT_. [online] Available at: <https://pr.phillypolice.com/phillypolice-unit-profile-special-weapons-and-tactics-swat/> [Accessed 11 May 2012].

[5] Balko, R., 2013. Rise of The Warrior Cop. 1st ed. Perseus Books Group.

[6] (Rise of the Warrior Cop: : The Militarization of America's Police Forces, by Radley Balko)

[7] DHS program to militarize the departments for counterterrorism. (Rise of the Warrior Cop: The Militarization of America's Police Forces, by Radley Balko)

armored truck and 255 automatic assault rifles.[8]

19.      Further broadening the scope of police power, police departments across the nation made powerful use of the 1968 Supreme Court decision in *Terry v. Ohio*. *Terry* fundamentally changed the way in which the power of government, through the police, could invade the liberty of individuals. The holding in *Terry* enabled police officers to intrude upon the liberty interests of all persons, including law abiding citizens, with only reasonable suspicion of a present crime or reasonable suspicion that a crime is about to be committed. During the past almost-five decades, the *Terry* decision has far too often been used by police to justify profile stops of African Americans.

20.      Since the Supreme Court's decision in *Terry v. Ohio*, there has been 50 years of unprecedented, court-sanctioned expansion of police power. As reported by the ACLU in 2014, over one third of the stops conducted by the Philadelphia Police Department were without reasonable suspicion. Furthermore, the racial disparity reflected in the following statistics reinforces the existence of systemic and institutional racism: Although Philadelphia's population is 42.26 percent white, 43.22 percent Black, Black and Hispanic residents accounted for 80 percent of the stops and 89 percent of the frisks conducted by the police.[9]

21.      The racial disparity in the number of unlawful stops and frisks by Philadelphia Police mirrors the statistics involving the use of deadly force. As reported by the Justice Department in 2015, from 2007 to 2014 there were 394 police involved shootings and 81% of the

---

[8]  NBC Local News, 2014

[9] Collaborative Reform Institute As Assessment on Deadly Force in the Philadelphia Police Department. George Fachner and Steven Carter. Community Oriented Policing Services Justice Department 2013.

those shot by police during this time period were African-American. [10]

22.     Over the course of the last 30 years there, have only been two police officers charged with murder for the killing of a person while on duty in Philadelphia. It is this historical backdrop that provided the impetus for the burgeoning movement for racial justice. During the period between 2013 and 2014, there were 56 police involved shootings, zero criminal prosecutions, and almost no discipline against the officers involved in those incidents.

A.     **Criminalization of First Amendment Expression in the City of Philadelphia**

23.     From the 1950s through the 1970s, peaceful, progressive movements seeking political change were labeled by the United States government as "threats" to national security. The COINTELPRO program established by the FBI was designed to infiltrated, discredit, disrupt, and criminalize those fighting for racial justice and opposed to the war in Vietnam.  Following September 11, 2001, the United States government increased surveillance programs in order to spy on citizens. Government agencies undermined the First Amendment rights of thousands of people engaged in lawful, peaceable protests. The Philadelphia Police Department, like many departments across the country, engaged in spying on progressive political movements as if those movements were terrorist organizations.

24.     Viewing peaceable, progressive protesters as a threat to national security has been fueled by an age-old paradigm perpetuated by the FBI and other law enforcement agencies. The War on Crime morphed into the War on Drugs and, then, into the "War on Terror." These are all wars on the civil liberties of our civilian population.

25.     In August 2000, the Philadelphia Police Department prevented a group of activists

---

[10] *Id.*

and artists from Philadelphia from expressing their political views at the Republican National Convention.  Prior to the convention, organizers sought permits to allow meaningful free speech activity. They were repeatedly rebuffed.  During the Convention, Police Commissioner Timoney, District Attorney Lynn Abraham, and the other city officials carried out mass arrests without any lawful basis. The police targeted for arrest individuals perceived to be leaders. Police and prosecutors pushed for excessive bail and incarcerated protesters for the purpose of curtailing their exercise of First-Amendment-protected rights during the convention.

26.     In Spring and early Summer 2000, law enforcement officials from the FBI, Pennsylvania State Police, Washington, D.C. Police Department, and Philadelphia Police Department met in Philadelphia for the purpose of coordinating efforts to undermine, intimidate, and thwart political speech during the Republican National Convention in Philadelphia. As early as July 2000, law enforcement conducted surveillance and harassed activists and artists at various locations. During the Convention, people perceived as potential leaders of protest activity in Philadelphia were targeted for arrest without any evidence of illegal activity.

27.     On July 25, 2000, Pennsylvania State Police agents infiltrated a warehouse located at 4100 Haverford Avenue in Philadelphia (the Puppet Space), which activists rented as a studio for puppet making, street theater rehearsal, meetings, and preparations for demonstrations.  The Pennsylvania State Police conducted this infiltration rather than the Philadelphia Police in order to avoid restrictions on the Philadelphia Police Department due to a previous agreement not to infiltrate activist groups. All of the activists in the Puppet Space were arrested for preparing for demonstrations protected by the First Amendment. All activists were eventually exonerated of the false charges brought by the District Attorney's Office.

28.     Prior to August 1, 2000, the Philadelphia Police Department, along with the

Pennsylvania State Police and in consultation with officials from the Washington, D.C. Police Department, compiled unsubstantiated and inaccurate information gleaned from the FBI and a right-wing political thinktank. This information became the basis for the affidavit of probable cause to search the Puppet Warehouse. The affidavit characterized prospective demonstrators as potential criminals. The affiant demonized the protesters in an effort to circumvent the requirement of the First and Fourth Amendments to the U.S. Constitution. Most of the over-four-hundred people charged with criminal offenses related to protest activity during the RNC were found not guilty. The civil rights suits filed on behalf of many of the protesters wrongfully arrested were settled for hundreds of thousands of dollars.

29.     The "War on Terror" brought with it an expansion of police power to conduct domestic surveillance. As noted by the Brennan Center for Justice in a report published in 2013, prior to 9/11, police departments loosened restrictions for monitoring First-Amendment-protected activity, under the discredited theory that "acts of terrorism are preceded by many legal activities" that could be uncovered by authorizing the police to spy on religious and political organizations.[11]

30.     In 2011, a spontaneous nationwide protest movement emerged. The Occupy movement challenged corporate power and its impact on our democracy. The "Occupy Philly" members, as part of this national movement for economic equality, gathered to express individual and collective voices in protest against corporate control over our government, which usurps our democracy. Formed spontaneously in early October 2011, the association, known as "Occupy Philly," organized as a protest gathering (frequently referred to as an "encampment") on Dilworth Plaza, outside of City Hall. This gathering, or encampment, served as an ongoing demonstration

---

[11] Brennan Center For Justice, National Security and Local Police, Michael Price 2013

in a public space – an expression of the cherished freedoms we enjoy under the First Amendment to the United States Constitution. During the existence of the Occupy Philly encampment, there were four mass arrests that resulted in the protesters being charged with various criminal offenses related to their First-Amendment-protected activities. All of the protesters were found not guilty, and a civil suit vindicating their First and Fourth Amendment rights was eventually settled.

31.    In 2013, the Black Lives Matter movement emerged following the 2012 shooting death of teenager Trayvon Martin in Sanford, Florida and the subsequent acquittal of vigilante George Zimmerman in a criminal trial. The movement gained momentum in 2014 following two events. First, a Black man named Eric Garner was killed when New York City Police Department officer Daniel Pantaleo used a chokehold to subdue the unarmed Mr. Garner. Secondly, teenager Michael Brown was shot and killed by police officer Darren Wilson in Ferguson, Missouri. Protests were met with heavily armed SWAT teams in riot gear. Peaceable protest was once again met with military force.

32.    The movement soon spread across the country to many cities, including Philadelphia. The Black Lives Matter movement focused on police brutality, profile stops, and mass incarceration. The killing of African-American men in Philadelphia, Brandon Tate Brown, David Jones, and Dennis Plowden Jr. by Philadelphia Police intensified the calls for meaningful criminal justice reform. Advocating for equal justice by marching in the streets and protesting at the sites of police-involved shootings and courthouses are both significant expressions of our democratic system at work. In an effort to criminalize this peaceful civil rights movement, the FBI labeled the Black Lives Matter movement a "domestic terrorist organization," escalating the war on dissent and a fundamental attack on our First Amendment rights.

33.    The tragic death of George Floyd brought resurgence to a movement that reflects

centuries-old struggles to achieve equal justice. Mr. Floyd's death did not change the response of law enforcement in Philadelphia.  Developed over the course of decades, the peaceable protests that occurred on May 31, 2020 and June 1, 2020, as described below, were met with violent and brutal military style attacks.  This lawsuit serves as the answer to those brutal attacks.

34.    The plaintiffs are a diverse group of people who were peaceably protesting against the long history of systemic police misconduct and brutality in this country, peaceably observing the protests, and/or otherwise peaceably existing in their neighborhood. The plaintiffs were subjected to law enforcement officers' shocking and unlawful actions.  They bring this civil rights action under 42 U.S.C. § 1983 seeking to hold the City of Philadelphia accountable for its violations of their First and Fourth Amendment rights.

35.    On February 23, 2020, Ahmaud Marquez Arbery, a 25-year-old Black man, was shot and killed by vigilante Travis McMichael, who was acting in concert with his father, fellow vigilante Gregory McMichael, and a third vigilante named William Bryan. The elder McMichael is a former member of the Glynn County Police Department and former investigator for the Brunswick Judicial Circuit District Attorney's Office. At the time of the incident that led to his murder, Mr. Arbery was jogging in the Satilla Shores neighborhood of Glynn County, Georgia. At least one resident called 911 to report seeing a person enter an under-construction home in the neighborhood. The person who entered the unfinished dwelling is widely speculated to have been Mr. Arbery. Video evidence shows an individual resembling Mr. Arbery exit empty-handed. A subsequent video captured by suspect Bryan shows Mr. Arbery jogging down a street delete comma while being followed by suspect Bryan in a vehicle and being cut off by the McMichaels in pickup truck up ahead. Mr. Arbery attempted to go around the McMichaels and their vehicle. Mr. Arbery was confronted instead. A struggle ensued and Mr. Arbery was seen defensively

tussling with the younger McMichael over a shotgun. Three distinct shots were heard, and Mr. Arbery stumbled and fell to the ground shortly after the last shot. The elder McMichael jumped from the bed of the pickup truck, pointing a handgun in the direction of Mr. Arbery. For more than two months, no arrests were made and multiple prosecutors either declined to bring charges against anyone involved or recused themselves from the case due to personal ties to Gregory McMichael. The case largely flew under the radar during this time. On May 5, 2020, a local radio station obtained and posted online a copy of suspect Bryan's video. The video and Mr. Arbery's story went viral and became the subject of national and international debate.

36.    On March 13, 2020, Breonna Taylor, a 26-year-old Black woman, was shot and killed by members of the Louisville Metro Police Department dressed in plainclothes and serving a no-knock search warrant on Ms. Taylor's home at or about midnight. Her boyfriend, Kenneth Walker, justifiably fired a legally-possessed firearm, reasonably believing that the unidentified and plainclothes police officers were intruders breaking into the couple's home. In response, police officers Jonathan Mattingly, Brett Hankison, and Myles Cosgrove fired more than 20 shots, striking Ms. Taylor eight times. Mr. Walker called 911, exclaiming to the operator that someone had broken into his home and shot his girlfriend. Mr. Walker was arrested and charged with attempted murder of a law enforcement officer and assault. The primary targets of the police investigation were two individuals who were suspected of selling drugs more than ten miles away from Ms. Taylor's home. One of the targets previously had a relationship with Ms. Taylor. No narcotics were found in the home or in possession of Ms. Taylor or Mr. Walker. Ms. Taylor's death at the hands of law enforcement officers garnered international attention and outrage.

37.    On May 25, 2020, George Perry Floyd Jr., a 46-year-old Black man, became yet another victim of state-sanctioned violence against Black people when he was killed by police

officers in Minneapolis, Minnesota. Mr. Floyd's arrest and subsequent murder were captured on video by at least one civilian witness, multiple police-worn body cameras, and multiple surveillance cameras in the area of the incident. Darnella Frazier, a 17-year-old witness to Mr. Floyd's murder, posted on social media the video she recorded. . By the next morning, that video had gone viral, having been viewed millions of times and broadcast by numerous media outlets. The video depicts a brutal killing in which former Minneapolis police officer Derek Michael Chauvin kneeled and pressed his knee on Mr. Floyd's neck continuously for eight minutes and 46 seconds. During the eight minutes and 46 seconds, Minneapolis police officers Tou Thao, James Alexander Kueng, and Thomas Kiernan Lan stood by and took no action to rescue Mr. Floyd from his tragic fate. Bystanders begged Derek Chauvin to get off Mr. Floyd's neck. Before he became unresponsive, Mr. Floyd pled for his life, desperately and repeatedly crying: "I can't breathe."

38. Mr. Arbery, Ms. Taylor, and Mr. Floyd's murders were merely the latest internationally-publicized examples in a long and sordid history of active, former, and wannabe law enforcement officers committing acts of brutality against Black people in the United States. Within 24 hours of the video depicting George Floyd's murder being released, protests started in Minneapolis. Within days, tens of thousands of demonstrators took to the streets in small towns and major cities across the United States. By week's end, public protests were occurring on a daily basis all over the world. In each protest, demonstrators expressed frustration and anger over an unending line of racist murders of Black people, culminating in the killing of Mr. Floyd. At the core of each protest were three central demands: an end to police brutality, accountability for police brutality, and the fair and equitable treatment of Black people.

39. These constitutionally protected and essential protests occurred and continue amid an unprecedented public health crisis. Novel coronavirus, COVID-19, has killed over 138,000

people in the United States and continues to spread. The virus is commonly understood to be transmittable through exposure to respiratory droplets. Public health officials advised people to wear masks if they were outside and to stay at least six feet apart. Philadelphia, as set forth in detail herein, is a city with a long history of racist and violent police practice. Here in the city, people participated in multiple demonstrations in the week after George Floyd's death. As was widely reported in local media, the Philadelphia Police Department ("PPD") was ill-prepared for such demonstrations, and, instead of acting to ensure the safety of people engaged in peaceable protest, the City's officials and officers responded with violent and aggressive tactics, resulting in increasing public anger and frustration.

40.     On May 31, 2020, in residential and commercial areas in West Philadelphia, PPD used violent crowd control tactics against peaceable demonstrators and police observers, including indiscriminately firing tear gas canisters and flashbangs into crowds and at individuals and shooting projectiles at residents, demonstrators, and observers. The residents, demonstrators, and observers remained peaceable.

41.     Plaintiffs were among those residents, protesters, and observers were present in West Philadelphia and fired upon by Philadelphia police.

42.     Without provocation or warning, officers began to fire tear gas canisters at the residents, demonstrators, and observers who were peaceably gathered in West Philadelphia. Residents, demonstrators, and observers can be seen in videos crouching in fear for their lives and hiding behind parked vehicles to avoid being targeted by Philadelphia police officers dressed in full body armor and flanking armored police vehicles. These residents, demonstrators, and observers can be seen cautiously backing away from Philadelphia police officers because they were too terrified to turn their backs on the heavily-armed and aggressive officers.

17

43.     Philadelphia police continued to fire tear gas canisters at the residents, demonstrators, and observers even as they were walking away. Video recordings were streamed live to Facebook and other media platforms, showing residents, demonstrators, and observers narrowly escaping being hit by tear gas canisters fired at them and causing them to be overcome by the gas, rendering them unable to breathe or see.

44.     On June 1, 2020, the largest demonstration yet took place in Philadelphia. Thousands of protesters marched through the streets of Center City and made their way to the Vine Street Expressway.  Philadelphia police officers on the scene did not attempt to stop them and allowed them onto the highway.  Protesters marched along the highway, chanting, and waving signs.  Drivers whose cars were stopped by the demonstration honked horns in support of the protesters.  Many drivers and passengers got out of their cars and chanted with the protesters to show their support.  The demonstration remained peaceable.

45.     Plaintiffs were among those protesters who were allowed by Philadelphia police to march onto the Vine Street Expressway. Without provocation or warning, however, police officers began to fire tear gas canisters at the demonstrators. As demonstrators began to frantically flee, police officers fired at demonstrators what were later described as ostensible "less than lethal" munitions. Through their use of tear gas and their positioning of personnel, officers began kettling the protesters by closing off all exit points and pinning hundreds of demonstrators onto a steep grassy embankment on the north side of the highway. Kettling is a police tactic whereby officers effectively control people's movements. Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech.

46.     As demonstrators were trapped on that embankment, officers continued to fire tear gas canisters and ostensible "less-lethal" rubber projectiles, leaving the protesters trapped in a

18

suffocating cloud of smoke, gas, and projectiles.  Video recordings made by people at the scene were rapidly posted to social media platforms showing protesters overcome by the gas, screaming – in a disturbing echo of George Floyd's last words – "I can't breathe."

47.     The people subjected to these unlawful actions had gone into the city streets to protest police brutality.  In return for their actions, they too were victimized by police brutality. Many of the people subjected to tear gas and fired munitions, including the plaintiffs who bring this action, suffered substantial harms, including physical injuries, difficulty breathing, nausea, vomiting, and significant emotional trauma and distress.

48.     The police violence that plaintiffs and other lawful, peaceable demonstrators were met with on May 31, 2020 and June 1, 2020 is a continuation of a reprehensible history of oppression of civil rights activists. The peaceable assembly of people seeking systemic change in the criminal justice system, like the assembly of plaintiffs and others on May 31, 2020 in West Philadelphia and on June 1, 2020 on the Vine Street Expressway, is based on a decades-old history of civil rights activism in this nation. Following the long tradition of those who marched for voting rights on Sunday, March 7, 1965, in Selma, Alabama, plaintiffs sought to address racial inequities. But like that "Bloody Sunday" 55 years ago, Plaintiffs' peaceable, lawful assembly was met by police violence.

49.     On June 2, 2020, the day after the incident on the Vine Street Expressway, Philadelphia Police Commissioner Danielle Outlaw issued a memorandum to all PPD officers making changes to the PPD use of force policy and acknowledging that the decision to use the force on the Vine Street Expressway was a decision made by the City of Philadelphia and that the decision was a deliberate one.  Commissioner Outlaw, while inexplicably failing to address the unfettered violent behavior of Philadelphia police officers in West Philadelphia on May 31, 2020,

thus confirmed that the harms caused to the peaceable demonstrators who entered the highway on June 1, 2020 were the result of the City's policy choice.

50.     During the next several weeks, City officials were subjected to persistent and vocal criticism for the use of force they authorized on the Vine Street Expressway and in West Philadelphia.  In response, these officials gave shifting explanations for who made the decision to use that force while claiming that the force was justified by the circumstances of the demonstration on the Vine Street Expressway and refusing to accept any responsibility for the unlawful conduct of PPD officers in West Philadelphia.

51.     On June 25, 2020, The New York Times published a visual investigation, based on an online compilation of videos collected from the scene.[12]  That investigation concluded that the protest on the Vine Street Expressway was not violent and that the police use of force on protesters was excessive.

52.     Within hours of publication of the investigation, Philadelphia Mayor James "Jim" Kenney and Commissioner Outlaw conducted a news conference in which they both apologized for the use of force against peaceable protesters.  Immediately after the news conference, Mayor Kenney sent a tweet conceding that "members of the Police Department used completely unacceptable force" and stating, "I also am accountable.[13]

53.     Defendants' actions to shut down the Vine Street Expressway and West Philadelphia demonstrations are the manifestation of the very authoritarianism against which the First Amendment was intended to protect. Plaintiffs seek to uphold, against uncivil, unwarranted,

---

[12]  Christopher Koettl et al., *How the Philadelphia Police Tear-Gassed a Group of Trapped Protesters*, New York Times (June 25, 2020), *available at*, https://www.nytimes.com/video/us/100000007174941/philadelphia-tear-gas-george-floyd-protests.html.

[13] Jim Kenney, Twitter (June 25, 2020), *available at*, https://twitter.com/PhillyMayor/status/1276242680612347907.

unjust, and blatantly unconstitutional attack, cherished rights enshrined in the First and Fourth Amendments to the United States Constitution and foundation to our democracy: the rights to peaceable assembly, petition for redress of grievances, freedom of speech, freedom of the press, and freedom from unwarranted seizures by the government.

54.     Through this action, plaintiffs seek to hold the City and its policymakers to their promise of accountability.

## III.   **JURISDICTION**

55.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## IV.   **PARTIES**

56.     Plaintiff Diamonik Hough, a resident of Philadelphia, PA, was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

57.     Plaintiff Katharine Miller, a resident of Philadelphia, PA, was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

58.     Plaintiff Christina Sorenson, a resident of Philadelphia, PA, was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

59.     Plaintiff Kelsey Romano, a resident of Philadelphia, PA, was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

60.     Plaintiff Christopher Romano, a resident of Philadelphia, PA, was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

61.      Plaintiff Maxwell Hibbard, a resident of Philadelphia, PA, was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

62.     Plaintiff Ilshim Pearlman, a resident of Philadelphia, PA, was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

63.     Plaintiff Mark Tyler a resident of Philadelphia. PA, was peaceably observing police in the area of 51st and Chestnut Streets on May 31, 2020.

64.     Plaintiff Damone Jones, Sr., a resident of Delware County, PA, was peaceably observing police in the area of 51st and Chestnut Streets on May 31, 2020.

65.     Plaintiff Abbey Tennis, a resident of Philadelphia, PA, was peaceably observing police in the area of 51st and Chestnut Streets on May 31, 2020.

66.     Plaintiff Hannah Gallo, a resident of Philadelphia, PA, was peaceably observing poice in the area of 51st and Chestnut Streets on May 31, 2020.

67.     Plaintiff Jessica Rosenberg, a resident of Philadelphia, PA, was peaceably observing police in the area of 51st and Chestnut Streets on May 31, 2020.

68.     Plaintiff Zachary Borzone, a resident of Philadelphia, PA was demonstrating peaceably on the Vine Street Expressway on June 1, 2020.

69.     Plaintiff Sarah Bouayad, a resident of Philadelphia.   Plaintiff Bouayad was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

70.     Plaintiff F.B., a minor by and through his Guardian, Christine Burton is a resident of Montgomery County, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

71.     Plaintiff Sasha Burton, a resident of Montgomery County PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

72.     Plaintiff Heidi Cannon, a resident of Philadelphia PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

73.     Plaintiff Jordan Carrick, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

74.     Plaintiff Justin Curtis, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

75.     Plaintiff Violet Cutler, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

76.     Plaintiff Amanda Damron, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

77.     Plaintiff Gabriel Elsheakh, a resident of Philadelphia PA, was peaceably demonstrating on the Vine Street Expressway in June 1, 2020.

78.     Plaintiff Daniel Feder, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

79.     Plaintiff Heather Gettis, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

80.     Plaintiff Ezra Ghizzone, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

81.     Plaintiff, Leo Habbs, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

82.     Plaintiff Savannah Hamilton, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

83.     Plaintiff Alessandra Hankinson, a resident of Philadelphia, PA, was peaceably demonstrating near the Vine Street Expressway on June 1, 2020.

84.     Jamila Hankinson, a resident of Philadelphia, PA, was peaceably demonstrating near the Vine Street Expressway on June 1, 2020.

85.     Susan Hankinson, a resident of Philadelphia, PA, was peaceably demonstrating near the Vine Street Expressway on June 1, 2020.

86.     Ahmad Hankinson, a resident of Philadelphia, PA, was peaceably demonstrating near the Vine Street Expressway on June 1, 2020.

87.     Plaintiff Blake Hastings, a resident of Philadelphia PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

88.     Plaintiff Samantha Heth, a resident of Philadelphia, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

89.     Plaintiff Tsarina Islam, is a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

90.     Plaintiff Ivan Juarez, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

91.     Plaintiff Sophia Khan, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

92.     Plaintiff Adam Knapp, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

93.     Plaintiff Joseph Koehler, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

94.     Plaintiff Bernard Lambert, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

95.     Plaintiff Justina LeDonne, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

96.     Nathaniel Miller, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

97.     Plaintiff Joe Piette, a resident of Philadelphia, PA, was peaceably demonstrating near the Vine Street Expressway on June 1, 2020.

98.     Plaintiff Elijah Blanton, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

99.     Plaintiff Delaney Keefe, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

100.     Plaintiff Shawn Lynch, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

101.     Plaintiff Brian McCaffery, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

102.     Plaintiff Allison Ruffner, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1. 2020.

103.     Plaintiff Minh Tran, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

104.     Plaintiff Skylar Watkins, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

105.     Plaintiff Amber Wright, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

106.    Plaintiff Patrick Wargo, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

107.    Plaintiff Jacob Parente, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

108.    Plaintiff Bryan Ortiz, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

109.    Plaintiff Christopher McDaniel, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

110.    Plaintiff Sebastian Lopez, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

111.    Plaintiff Andrew Powers, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

112.    Plaintiff Kairtlyn Rafferty, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

113.    Plaintiff Jonathan Saltlow, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

114.    Plaintiff Mallory Schneider, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

115.    Plaintiff, Erin Schenkenbach, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

116.    Plaintiff Elias Sell, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

117.    Plaintiff Walter Smolarek, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

118.    Plaintiff Gwen Snyder, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

119.    Plaintiff Matthew Sullivan, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

120.    Plaintiff Sean Welch, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

121.    Plaintiff Callum Wilson, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

122.    Plaintiff Seamus Wilson, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

123.    Plaintiff Robert Zolitor, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

124.    Plaintiff Maheen Shafi, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

125.    Plaintiff Emily Quast, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

126.    Plaintiff Cea Fortarezzo Ortiz, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

127.    Plaintiff Brad Pulley, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

128.    Plaintiff, Skylar Watkins, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

129.    Plaintiff Taylor Brown, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

130.    Plaintiff Shannon Roche, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

131.    Plaintiff Joshua Walker, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

132.    Plaintiff Gabrielle Eisenhower, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

133.    Plaintiff Jonathan Satlow, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

134.    Plaintiff Megan Oehlbeck, a resident of Philadelphia, PA, was peaceably demonstrating on the Vine Street Expressway on June 1, 2020.

135.    Plaintiff Crystal McBee, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

136.    Plaintiff Leo Habbs, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

137.    Plaintiff Gwen Snyder, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

138.    Plaintiff Matthew Sullivan, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

139.    Plaintiff Karen Hamilton, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

140.    Plaintiff Andre Bullock, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

141.    Plaintiff Gloria Hosten, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

142.    Plaintiff Allegra King, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

143.    Plaintiff Darryl McMillian, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

144.    Plaintiff Betty Rudd, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

145.    Plaintiff Sabrina Rudd, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

146.    Plaintiff Gregory Spearman, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

147.    Plaintiff Sylvia Towns, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

148.    Plaintiff Vaughn Towns, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

149.    Plaintiff Timothy Tyler, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

150.    Plaintiff Eric White, a resident of Philadelphia, PA, was a bystander in the area of 52nd Street and Market Streets on May 31, 2020.

151.    Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department.  At all times relevant to this Complaint, each of the City officials referenced below, including Mayor Kenney, Commissioner Outlaw, and Deputy Commissioner Dennis Wilson was a policymaker for the City of Philadelphia with respect to police matters.  To the extent any of these or other officials is not deemed a policymaker under relevant law, each official had policymaker authority delegated to them with respect to the matters in this Complaint.

152.    Defendants Jane/John Does 1-100 were at all times relevant to this Complaint police officers employed by the City of Philadelphia, Pennsylvania State Police, and other law enforcement agencies who acted under the direction of, and in concert and conspiracy with, the City of Philadelphia. The identities of these defendants are not presently known, and plaintiffs will amend this Complaint to properly name all defendants after preliminary discovery.

153.    At all times relevant to this Complaint, all defendants acted under color of state law and in concert and conspiracy.  All defendants are jointly and severally responsible for the harms caused to plaintiffs.

**V. FACTS**

154.    Despite the lessons learned from protests, press, research, and lawsuits through the early 2010s, the City of Philadelphia continued in its acquiescence to unconstitutional conduct by its officers. In that time period, as the use of smartphones to record videos of police engaged in misconduct grew rapidly, Philadelphia police officers routinely retaliated against civilians who sought to lawfully observe and record public police activity. When police arrested and physically

abused people for the mere act of lawfully recording video, the City failed to train, supervise, and/or discipline its officers. Instead, in response to lawsuits brought by people subjected to such unlawful retaliation, the City argued in federal courts that its officers were protected by the legal doctrine of qualified immunity.

155.     In late 2019, Philadelphia Mayor Kenney announced the hiring of Danielle Outlaw as Philadelphia Police Commissioner. Mayor Kenney did so, knowing that Commissioner Outlaw had been the subject of extensive criticism for her handling of political protest in her position as police commissioner in Portland, Oregon.  While Commissioner Outlaw was running the Portland Police Department, officers under her supervision engaged in violent assaults against protesters, and Commissioner Outlaw refused to punish any of those officers.   In her first public appearance in Philadelphia, Commissioner Outlaw was questioned about how she would address political demonstrations in the City of Philadelphia given its rich history of activist culture.  She responded by asserting that she is "a firm believer in upholding free speech and the right to assembly."[14] Commissioner Outlaw began her duties as Commissioner in February 2020.  Three months later, her assurance that Philadelphia police under her supervision would protect the right to engage in peaceable political demonstration was proven to be a hollow promise.

A.     **Protest in Philadelphia Following the Murder of George Floyd and the Decision of Policymakers to use Excessive Force through Ostensible "Less Than Lethal" Munitions**

---

[14] Max Marin, *New PPD chief sparred with demonstrators in Portland. How will she handle Philly's protest culture?*, BillyPenn (Dec. 31, 2019), *available at*, https://billypenn.com/2019/12/31/new-ppd-chief-sparred-with-demonstrators-in-portland-how-will-she-handle-phillys-protest-culture/.

156.     Following the murder of George Floyd, on May 25, 2020, protests grew around the country, including Philadelphia.  As the first weekend following Floyd's murder approached, City officials knew or should have known to expect massive demonstrations throughout the city.

157.     Based on prior experience, the City and the named Defendants, had developed plans to address massive protests.  The plans were focused on activating hundreds of officers to engage in crowd control with the goal of allowing peaceable protesters to march with minimal interference.

158.     Despite their knowledge and expectation that massive protests would occur throughout the City, by May 30, 2020, the Philadelphia Police Department and the named Defendants had not implemented any of their previously existing operational plans to ensure demonstrators' safety.

159.     Throughout the day, peaceable protests grew in size. In Center City Philadelphia, large groups marched in different directions at the same time.  Officers had no coordinated plan with officers haphazardly dispatched from one location to another in attempts to keep up with the crowds.  Separately, some small groups of people, acting on their own, began to vandalize stores in major retail corridors.  Scores of people were injured and properties were damaged.

### B.     The May 31, 2020 Philadelphia Police Assault on West Philadelphia Residents and Demonstrators

160.     The next day, May 31, 2020, Commissioner Outlaw acknowledged that the Philadelphia Police Department had been slow to implement a plan to respond to protests, telling reporters that a coordinated strategy "did not happen as quickly as I would've liked it to occur."[15]

---

[15] Chris Palmer et al., *As unrest spreads, Philly officials struggle to assess police response to the violence and looting*, The Philadelphia Inquirer (May 31, 2020), *available at*, https://www.inquirer.com/news/philadelphia-police-department-george-floyd-protests-looting-violence-vandalism-20200531.html.

161.    On May 31, 2020, after Commissioner Outlaw acknowledged PPD's poor planning for demonstrations, a large group of protesters gathered on 52nd Street, known as one of West Philadelphia's main thoroughfares.  The named Defendants and Jane/John Doe Defendants of the Philadelphia Police Department activated the para-military units of the Police Department, such as SWAT and the Counterterrorism Unit. These officers brought into the area military-style armored vehicles.  Officers in those vehicles, outfitted in full body armor with gas masks, face shields, helmets, and weapons exited those vehicles and fired tear gas and ostensible "less-lethal" rubber bullets at alleged "looters."   Officers did not stop there. They continued to fire tear gas canisters and rubber bullets on peaceable protestors and bystanders throughout residential streets adjacent to 52nd and Market Streets, causing extreme physical and mental harm to residents who were, inter alia, many of whom were merely observing from the sidewalk, standing on their front porches, or simply existing inside their homes.

162.    It thus became clear that, in order to address the initial lack of planning that Commissioner Outlaw acknowledged on May 31, 2020, by that afternoon, before the activity on 52nd Street, the City's policymakers, along with the named and yet to be named Jane/John Doe Defendants, had developed a plan to use extreme force against political protesters, including tear gas canisters, pepper spray, and ostensible "less-lethal" projectiles, commonly referred to as rubber bullets. The City's policymakers seemed to coordinate with police departments across the country, including New York City and Los Angeles, in its handling of protesters by using military tactics to intentionally trap them spaces and then employ these measures of extreme force.

163.    Tear gas, or "CS gas," is a synthetic compound that causes irritation of mucous membranes, the skin, and the eyes, resulting in tearing, extreme pain, coughing, and difficulty breathing.  Tear gas is usually disbursed through the firing of canisters, which explode and release

the compound in the air.  When used in close spaces or in large amounts, these effects can be enhanced or even fatal.  Under the Geneva Convention, the use of tear gas is banned in warfare.

164.    Pepper spray, also known as oleoresin capsicum, or OC spray, is different from tear gas in that it is not synthetic.  It causes extreme pain in the eyes, often described as a "bubbling" or "boiling" sensation.  Pepper spray is disbursed through aerosolizing the compound in liquid streams or mists.  It is also sometimes fired in a projectile known as a "pepper ball."  Pepper spray is particularly dangerous to people with preexisting breathing deficits, such as asthma.

165.    Ostensible "less-lethal" projectiles, broadly defined, are munitions made from many different substances, including rubber, wood, or wax, that are fired from specially designed weapons.  Although intended not to cause fatalities, such projectiles are known to cause severe incapacitating, often permanent, injuries, including the loss of eyes, broken bones, and damaged internal organs as well as death in some circumstances.

166.    Given the dangerous and potentially fatal nature of tear gas, pepper spray, and ostensible less-lethal projectiles, standard police practices limit their usage to the most extreme circumstances.  At a minimum, such tactics require the presence of severe danger to the physical safety of other persons.  Indeed, published Philadelphia police directives provide, with respect to pepper spray, that it is not to be used "[f]or the dispersal of non-violent persons," "[f]or disorderly crowds," or "[i]n situations where people are peacefully exercising their Constitutional Rights of free speech of assembly."[16]

167.    The use of each of these mechanisms designed to deploy military style force as a means of crowd control in the context of political demonstrations is highly dangerous,

---

[16]  Philadelphia Police Department Directive 10.2, *Use of Moderate/Limited Force* at 9-10 (Sept. 18, 2015), *available at*, https://www.phillypolice.com/assets/directives/D10.2-UseOfModerateLimitedForce.pdf

inappropriate and antithetical to a democracy whose foundation is the right to free expression, association and assembly. The use of such methods against peaceful protesters not only poses substantial risks to the health and safety of the individuals engaged in the protest, as well as the bystanders, it is a threat to our democracy.

168.    Plaintiff Crystal McBee, went to retrieve her granddaughter who had joined the peaceable protest in the area of 52nd and Market Streets. Upon her arrival at 52nd and Market Streets, she observed a Philadelphia Police SWAT truck pull up. The Police Officers, Defendants Jane/John Doe, began firing tear gas into the peaceable crowd of protesters and bystanders. In fear for the safety of herself and her grandchild, Plaintiff McBee fled. When she got to Sansom Street, she was struck in the head by a ostensible "less-lethal" rubber bullet. She is still suffering from the physical pain and psychological anguish from being a victim of a military style assault by the Jane/John Doe Philadelphia Police officers.

169.    Plaintiff Gwen Synder and her husband Plaintiff Matt Sullivan, residents of the neighborhood in the area of 52nd and Market Streets were observing the Defendant Jane/John Doe SWAT officers pull up with what looked like a tank. Shortly after the arrival of the armored vehicle, the Defendant Jane/John Doe SWAT officers began launching tear gas cannisters at peaceable protesters, bystanders, and residents. Both Plaintiffs suffered tear gas inhalation. Plaintiff Gwen Snyder, in recalling the attack by the Defendant Jane/John Doe SWAT officers, stated the attack "left us crying and disabled and weeping and terrified. It was like nothing I'd ever seen, this total attack on our bodies and our dignities."

170.    Plaintiff Leo Habbs, a resident of the neighborhood in the area of 52nd and Market Streets, was a bystander on May 31, 2020 in the area of 52nd and Market. He observed an armored SWAT vehicle pull up and begin randomly firing at the crowd of bystanders. As Plaintiff Habbs

was leaving the area to avoid the tear gas, he was shot by Defendant Jane/John Doe Police Officer with an ostensible "less-lethal" rubber bullet. Plaintiff Habbs suffered tear gas inhalation and an injury from the rubber bullet.

171.    Plaintiff Karen Hoffman, an attorney and resident of the neighborhood in the area of 52nd and Market Streets, was a bystander observing the protest On May 31, 2020.  As she was walking with a friend in the area of 52nd and Walnut Streets, observing the protest, a Philadelphia Police SWAT vehicle pulled up and Jane/John Doe Police Officers and began firing tear gas cannisters at her. Plaintiff Hoffman suffered gas inhalation causing ulcers in her mouth.

172.    Plaintiff Mark Tyler is the pastor of Mother Bethel African Methodist Episcopal Church in Philadelphia. Rev. Tyler was a peaceable observer in West Philadelphia on May 31, 2020. He suffered exposure to tear gas while also having a tear gas canister fired at him and roll through his legs before being engulfed in smoke and tear gas.

173.    Plaintiff Dr. Damone B. Jones, Sr. is the Senior Pastor of Bible Way Baptist Church in West Philadelphia. Dr. Jones, a former President of the Police Clergy Program in the 19th Philadelphia police district, was a peaceable observer in West Philadelphia on May 31, 2020. He suffered exposure to tear gas while also having a tear gas canister fired at him before being engulfed in smoke and tear gas.

174.    Plaintiff Reverend Abbey Tennis is the Lead Minister First Unitarian Church of Philadelphia. Reverend Tennis, a resident of West Philadelphia, was a peaceable observer in West Philadelphia on May 31, 2020. She suffered exposure to tear gas while also having a tear gas canister fired at her before being engulfed in smoke and tear gas.

175.    Plaintiff Reverend Hannah Gallo is the Lead Minister First Unitarian Church of Philadelphia. Reverend Gallo was a peaceable observer in West Philadelphia on May 31, 2020.

She suffered exposure to tear gas while also having a tear gas canister fired at her before being engulfed in smoke and tear gas.

176.    Plaintiff Rabbi Jessica Rosenberg is a Reconstructionist Rabbi, born, raised, and based in Philadelphia. Rabbi Rosenberg was a peaceable observer in West Philadelphia on May 31, 2020. She suffered exposure to tear gas while also having a tear gas canister fired at her before being engulfed in smoke and tear gas.

177.    Plaintiff Andre Bullock was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Andre Bullock suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

178.    Plaintiff Gloria Hosten was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Gloria Hosten suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

179.     Plaintiff Allegra King was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Allegra King suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

180.     Plaintiff Darryl McMillian was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Darryl McMillian suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

181.     Plaintiff Betty Rudd was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Betty Rudd suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation,

emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

182.    Plaintiff Sabrina Rudd was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Sabrina Rudd suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

183.    Plaintiff Gregory Spearman was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Gregory Spearman suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

184.    Plaintiff Sylvia Towns was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Sylvia Towns suffered gas

inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

185.    Plaintiff Vaughn Towns was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Vaughn Towns suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

186.    Plaintiff Timothy Tyler was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near the north side of the 5100 block of Locust Street. Plaintiff Timothy Tyler suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

187.    Plaintiff Eric White was at home or visiting friends in the area of 52nd and Market Streets on May 31, 2020. A Philadelphia Police SWAT vehicle described as a 'tank" at or near the intersection of 52nd and Locust Streets began firing tear gas canisters from ground level while a Philadelphia Police SWAT helicopter began spraying tear gas from above the rooftops at or near

the north side of the 5100 block of Locust Street. Plaintiff Eric White suffered gas inhalation, nasal irritation, skin irritation, skin rash, tearing, coughing, difficulty breathing, pain sensation, emotional trauma, and/or psychological anguish as a result of what was described as "being under siege in a war zone" inside the neighborhood.

188.     The indiscriminate use of tear gas that continued for several hours on May 31, 2020 (and again on June 1, 2020, as shown below) forced protesters , including many of the named Plaintiffs,  to frequently  remove their masks in order to breathe and to clean their faces, rendering them more vulnerable and susceptible to COVID-19 infections.

### C.     The June 1, 2020 Philadelphia Police Assault on Vine Street Expressway Demonstrators

189.     As of the morning of June 1, 2020, the City's policymakers and the named and yet-to-be-named Jane/John Doe Defendants,  knew that the military style assault  deployed  on 52nd Street the night before had caused severe harm to dozens of innocent people, peaceable protesters, and residents of the neighborhood surrounding 52nd and Market Streets.  Despite that knowledge, they made  no  changes  with  regard  to  the  previous  day's  tactics.  On  June  1,  2020,  City policymakers proceeded to mobilize the tactical units, including the Defendant Jane/John Doe SWAT team officers in preparation for deployment against peaceable protesters.

190.     On the afternoon of June 1, 2020, thousands of demonstrators, including many of the named Plaintiffs gathered in Center City Philadelphia and began peacefully marching through the streets in support of the Black Lives Matter movement for racial justice.  As with protests that had  previously  occurred  in  Philadelphia  and  around  the  world,  demonstrators  were  protesting police violence against Black people, chanting "Black Lives Matter," and holding signs demanding accountability and systemic reform.

41

191.    Shortly before 5:00 p.m., the march made its way to the intersection of North 22nd Street and the Benjamin Franklin Parkway. From there, many of the protesters, including some of the Plaintiffs, marched down an entrance ramp from North 22nd Street onto Interstate 676 (known locally as the "Vine Street Expressway," a below-ground-level highway that traverses Center City Philadelphia from east to west and west to east). Many of the other protesters, including some of the Plaintiffs, remained in the area of the Ben Franklin Parkway, and the intersecting streets, 20th, 21st, and 22nd Streets.

192.    Philadelphia police officers were stationed at the top of the entrance ramp; they did not attempt to prevent the protesters, including many of the Plaintiffs, from entering the highway.

193.    Evening traffic on the highway was immediately stopped as protesters, including many of the named Plaintiffs, began to flood into all lanes of traffic.  The occupants of the vehicles stopped along the expressway showed their support by for the political message expressed by the protest by repeatedly honking their horns and waving to the protesters. Many drivers and passengers got out of their vehicles and momentarily joined the protesters' chanting.

194.    Protesters, including many of the named Plaintiffs, continued to peaceably march east on the highway. At no time was any violence or physical forced used by the protesters, including many of the named Plaintiffs.  No one during the course of the march on the expressway, Ben Franklin Parkway, or any of the adjacent streets – including police present for the purported purpose of crowd control – was ever in any physical danger.

195.    As protesters continued to march east under the North 21st Street overpass, they entered a long tunnel.

196.    Before they reached the other side of the tunnel, which ends just to the east of North 20th Street, a police SWAT team and upon information and belief Pennsylvania State Troopers,

were stationed at the far end of the tunnel waiting to confront the protesters. The Defendant Jane/John Doe SWAT team Officers were, like the officers present on 52nd Street the night before, dressed in full body armor, with helmets and face shields and armed with tear gas cannisters and weapons.

197.    Upon observing the Defendant Jane/John Doe SWAT Officers lined up at the other end of the tunnel, the protesters stopped marching forward but proceeded to protest by chanting and waving the banners and posters. At no time did the Defendant Jane/John Doe Officers inform the protesters, including many of the Plaintiffs, that they must disperse or they would be subject to tear gas, pepper spray, rubber bullets, and arrest.  Demonstrators were thus caught without any indication that they would be subject to an extreme, dangerous, and harmful use of force.

198.    The Jane/John Doe Defendant Police Officers SWAT team members armed with tear gas, pepper spray, and guns loaded with ostensible "less-lethal" rubber bullets entered the tunnel from the east side, approaching the protesters.  Without any verbal warning or command, the Jane/John Doe SWAT team Defendants began firing tear gas cannisters and rubber bullets as if they were engaged in combat with an armed enemy. Without warning or any verbal command, the SWAT unit began firing tear gas cannisters, pepper spray, and "less-lethal" rubber bullets at the protesters, including some of the named Plaintiffs. Shocked and full of terror, many of the protesters dropped to their knees and put their hands in the air in order to signal the Defendant Police Officers that they were peaceable. Terrorized by the military assault, many of the protesters, including many of the named Plaintiffs began to flee from the approaching clouds of tear gas and hail of rubber bullets. The Defendant Jane/John Doe Police Officers, along with Defendant Nicoletti, used pepper spray against the protesters, even when the demonstrators were attempting to turn around and go back the other way.  Defendant Jane/John Doe Officers also used pepper

spray to target members of the press who were witnessing and filming the peaceable actions of the demonstrators.

199.    In order to escape the huge clouds of tear gas, pepper spray, and "less-lethal" rubber bullets, the protesters climbed a hill and scaled the barrier and fence to reach Ben Franklin Parkway and adjacent streets only to be went with a second attack by Defendant Jane/John Doe Police Officers launching tear gas into the crowds at street level. To get away from the tear gas that officers had disbursed, remaining demonstrators trapped on the highway began to climb the hill. However, many of the protesters were trapped on the hill in the bottleneck created by the only means of escape.

200.    Shortly after police fired the first tear gas canisters, all of the protesters that were not arrested on the 676, left the highway, and police ordered the traffic that had been stopped on the highway to resume.

201.    At this point, all demonstrators were either on the embankment or had exited the highway the Defendant Jane/John Doe SWAT officers could not hide behind the pretext later used by the named Defendants to justify the violence leveled against peaceful protesters. The excessive use of force on hundreds of peaceable protesters who were no longer blocking traffic underscored the intention of the Defendant Jane/Jon Doe SWAT officers, both on 676, as well as on the Parkway and adjacent streets, to physically harm and punish protesters for engaging in a march and demonstration protected by the First Amendment.

202.    Clear evidence of the intention of the Defendant Jane/John Doe SWAT officers was the fact that they fired multiple tear gas canisters directly at the demonstrators trapped on the hill.

203.    As police were firing tear gas canisters, other officers using pepper spray were forcing demonstrators up the hill.

204.    Unable to breath or exit the hill because of the bottleneck, several protesters descended the hill towards the officers with hands raised in surrender simply to escape the tear gas, only to be directed by officers wearing gas masks to climb back up the hill and into the clouds of tear gas.

205.    These actions left hundreds of demonstrators stuck on the hill, unable to leave, while standing in clouds of smoke and tear gas.  Demonstrators were overcome with tear gas, coughing, vomiting, crying, and unable to breathe.

206.    The purported purpose of tear gas in a law enforcement context is to disperse unruly and violent crowds.  Given the actions of the officers, however, the demonstrators who were attacked with tear gas were unable to disperse, thus resulting in enhanced and prolonged exposure to the gas.

207.    The indiscriminate use of tear gas that continued for several hours on May 31, 2020 and June 1, 2020, forced many protesters to remove their masks in an attempt to breathe and to clean their faces, making them more susceptible to COVID-19 infections.

208.    While the Defendant Jane/John Doe SWAT officers subjected protesters to the harmful effects of tear gas, they began to discharge ostensible less-lethal munitions at the demonstrators.  Multiple demonstrators were struck with rubber bullets tear gas cannisters and other projectiles that resulted in injury and severe physical pain.

**D.    Richard Nicoletti, Jr. Attacks Three Kneeling And Surrendering Protesters By Removing Their Face Coverings And Spraying Tear Gas Directly Into Their Faces**

209.    Plaintiff Hough did not initially flee the police assault. Plaintiff Hough chose to exercise his right to peaceably protest and was willing to be arrested for his act of alleged civil disobedience in the manner Rev. Dr. Martin Luther King Jr. and other non-violent civil rights

activists of the 1960s. Hough sat down on the road with his hands raised in an act of surrender facing the oncoming SWAT officers and their armored vehicles.

210.    Plaintiff Miller, a white female, observed Hough, a Black male, sitting on the ground with his hands raised and saw officers advancing towards him. Given the history of police abuse against Black bodies, and the very nature of the day's protest, Miller feared for Hough's safety and sat down on the road in front of Hough in an attempt to protect him from being potentially fatally attacked by police officers. Miller also raised her hands in act of surrender assuming that she would be arrested by police.

211.    Plaintiff Sorenson, a white female, observed Hough, a Black male, sitting on the ground with his hands raised and saw officers advancing towards him. Given the history of police abuse against Black bodies, and the very nature of the day's protest, Sorenson feared for Hough's safety and sat down on the road in front of Hough in an attempt to protect him from being potentially fatally attacked by police officers. Sorenson knelt on the ground with her hands behind her back expecting to be arrested by the police officers approaching them.

212.    Defendant Nicoletti approached Plaintiffs Hough, Miller, and Sorenson as they were peaceably seated/kneeling on the expressway. Instead of placing the plaintiffs under arrest, defendant Nicoletti sprayed Hough, Miller, and Sorenson with a chemical agent as he approached them. Defendant Nicoletti began spraying Sorenson as he approached her.  Seeing that she was wearing safety goggles to protect her eyes, Nicoletti got close enough to touch Sorenson, pulled her elastic safety goggles away from her face, sprayed the chemical agent directly into her eyes, and then released the goggles, causing them to snap back onto her face.

213.    Defendant Nicoletti then moved to Miller, bent down to get closer to her, and sprayed her directly in the face. When defendant Nicoletti got to Hough, he physically assaulted

46

Hough by shoving him to the ground to expose his face and then sprayed him in the face multiple times at point blank range. None of the police officers ever made an effort to arrest Hough, Miller, or Sorenson.

214.    As a result of being sprayed directly in the face by defendant Nicoletti, Sorenson, Miller, and Hough's vision and breathing were severely compromised and they cried out in pain.

215.    As Hough blindly tried to escape the attack of defendant Nicoletti, he was struck by multiple ostensible "less-lethal" rubber bullets.  He was struck at least five times as an officer hunted him on the expressway. He was struck in his groin as he blindly waved his hands in surrender.  He then was struck in his back as he moved away in pain.  He was struck several more times in the arms and leg as he squatted and moved around a vehicle in an attempt to avoid being shot and to escape the assault.

216.    Once the Defendant Jane/John Doe SWAT team Officers began the assault, the march abruptly halted, ending the peaceable protest.  Within moments, the military style attack brought on by the Defendant Jane/John Doe SWAT team officers turned a peaceful day of celebratory protest into fear and panic as the protesters scrambled to escape rapidly approaching armed contingent. In fear for their physical safety, many of the protesters, including many of the named Plaintiffs as demonstrators, fled west.   The protesters in and around the Parkway and adjacent streets, including many of the named Plaintiffs, still engaged in peaceable protest, began to observe the terrifying events unfold below them on the Vine Street Expressway.

217.    With thirty foot walls on either side, the exit ramps blocked by additional Defendant Jane/John Doe Officers, and two heavily-armed contingents of the Defendant Jane/John Doe SWAT Officers converging from the east and west, hundreds of protesters were trapped with

seemingly no means to escape the tear gas canisters and ostensible "less-lethal" rubber bullets. Some of the protesters were able to escape through the exit ramps back onto 22nd Street.

218.     Several hundred protesters remained trapped between the two SWAT teams of Defendant Jane/John Doe Officers.  The only feasible means of escape was a steep grassy hill on the north side of the highway to the east of North 21st.  At the top of that hill was a concrete barrier with a tall metal fence on top.

**E.     Philadelphia Police Department Takes Aim At Panicked Protesters, Showering Them With A Hail Of Rubber Bullets And Tear Gas Canisters, While The Protesters Attempted To Scale A Grassy Slope And Iron Fence**

219.     Plaintiff Zachary Borzone was engaged in the protest on June 1, 2020 on the Vine Street Expressway. He was marching toward the front of the demonstration when, shortly after he entered the tunnel, he was shot in the stomach with a ostensible "less-lethal" rubber bullet fired by one of the Defendant Jane/John Doe SWAT officers causing a searing pain. As he later made his way up the hill, he was caught in a cloud of tear gas from the cannisters fired by the Defendant Jane/John Doe SWAT officers into the crowd of protesters scrambling to escape the attack. Plaintiff Borzone suffered tear gas inhalation which caused him severe pain and anxiety as he struggled to breathe. Plaintiff Borzone was eventually able escape the assault as he climbed the fence and entered the area around the Parkway.

220.     Plaintiff Sarah Bouayad was protesting on the Vine Street Expressway when the attack began by the Defendant SWAT officers. Plaintiff Bouayad suffers from asthma and was trapped with the other protesters on the hill. Ms. Bouayad suffered gas inhalation from the cloud tear gas as the Defendant Jan/John Doe SWAT officers, standing only several yards away, fired the tear gas cannisters into the crowd of protesters on the hill. Once she inhaled the tear gas Plaintiff

Bouayad thought she was going to die as she could not breathe for several agonizing seconds while trying to move to an area with fresh air.

221.    Plaintiff Jordan Carrick was protesting on the Vine Street Expressway when the attack initiated by the Defendant Jane/John Doe officers commenced. During his effort to escape up the hill he was enveloped by the cloud of tear gas and could not breathe as tear gas cannisters were landing nearby. Eventually, Plaintiff Carrick made it over the fence.

222.    Plaintiff Heidi Cannon was protesting on the Vine Street Expressway when the attack from the Defendant Jane/John Doe SWAT team began. Plaintiff Heidi Cannon was assisted up the hill by another protesters. Plaintiff Heidi Cannon suffered gas inhalation while on the hill and up on the Parkway after she escaped over the fence. She said it looked like "a war zone."

223.    Plaintiff Sasha Burton was protesting with her brother, Plaintiff F.B., a minor by and through his Guardian, Christine Burton. They were on 676, protesting, when the attack by the Defendant Jane/John Doe SWAT officers began. Plaintiff F.B. was shot with a rubber bullet. As the crowd of protesters were enveloped in the tear gas, Plaintiff Sasha Burton suffered tear gas inhalation and could not breathe. She was pinned against the ground by the panicked crowd attempting to escape the attack. Plaintiff Sasha Burton was eventually arrested by a Defendant Jane/John Doe SWAT team officer, and bound by zip ties behind her back for a long period of time. After several hours in police custody, Plaintiff Sasha Burton was issued a citation and released. Plaintiff Sasha Burton, an avid runner, still suffers from breathing problems over a month after inhaling the tear gas.

224.    Plaintiff Christine Burton, on behalf of her minor son F.B., asserts his interests in this cause of action as his guardian. Like his sister, F.B. was protesting for racial justice. F.B. suffered tear gas inhalation as a result of the actions of the Defendant Jane/John Doe SWAT

officers. While attempting to escape over the fence, F.B. reached the top of the fence. Then, Defendant John Doe SWAT officer grabbed him by his shorts in an effort to pull him off the fence. Once the Defendant Officer ripped F.B.'s shorts, and was unsuccessful in arresting him, the Defendant John Doe SWAT officer shot F.B. in the stomach with a rubber bullet at point blank range. F.B. was not arrested.

225.   Plaintiff Justin Curtis was protesting on 676 when the attack by the Defendant Jane/John Doe SWAT officers began sending tear gas cannisters into the crowd of protesters who were trying to escape up the hill and over the fence. Plaintiff Justin Curtis made it over the fence. After climbing over the fence, Defendant John Doe SWAT officer shot him in the face with a rubber bullet or some other projectile at point blank range, through the fence and as he was helping others get over the fence. Plaintiff Justin Curtis was hit with a rubber bullet or some other projective, which caused a painful injury to his face.

226.   Plaintiff Violet Cutler participated in the peaceable protest march on 676. Once the attack by the Defendant Jane/John Doe SWAT officers began, Violet ran to the hill to escape. While on the hill, Plaintiff Violet Cutler began to choke on the tear gas. Unable to breathe, Plaintiff Violet Cutler suffered a panic attack and could not move from the hill. Plaintiff Violet Cutler was falsely arrested by Defendant John Doe SWAT Officer and held in custody for several hours. Eventually, Plaintiff Violet Cutler was released after being issued a civil citation. Plaintiff Violet Cutler suffered bruises to the wrist and elbow.

227.   Plaintiff Amanda Damron was protesting on 676 when the attack by the Defendant Jane/John Doe Officers attacked with tear gas. She suffered tear gas inhalation and escaped through the fence – only to suffer the effects of tear gas inhalation a second time from an attack by Defendant Jane/John Doe Officers on the Parkway.

228.     Plaintiff Gabriel Elsheakh was protesting on 676 with Plaintiff Maheen Shafi and Plaintiff Patrick Wargo. All three Plaintiffs ran to the hill in an effort to escape the tear gas and hail of rubber bullets fired by the Defendant Jane/John Doe SWAT officers. Once they reached the hill, tear gas cannisters were fired into the crowd landing at the feet of all three. Plaintiff Gabriel Elsheakh, Plaintiff Maheen Shafi, and Plaintiff Patrick Wargo all suffered tear gas inhalation and for several terrifying seconds, could not breathe or see where they were going. Eventually, Plaintiff Gabriel Elsheakh and Maheen Shafi escaped over the fence. However, Plaintiff Patrick Wargo was pulled from the fence by Defendant John Doe SWAT officer and falsely arrested. The Plaintiff Patrick Wargo was zip tied, held for a long time on the highway, and then detained for hours. Eventually, he was issued a citation before he was released.

229.     Plaintiff Daniel Feder was one of the protesters marching on 676. Plaintiff Daniel Feder made his way to the hill once the attack from the Defendant Jane/John Doe SWAT officers began.  Overcome by the thick cloud of tear gas and unable to breathe, Plaintiff Daniel Feder collapsed on the hill, unable to make it over the fence. Defendant John Doe SWAT officer took his mask and glasses off of Plaintiff Daniel Feder's face and pushed him down the hill back onto 676. In the confusion following the assault on the hill, Plaintiff Daniel Feder was able to walk away without getting arrested.

230.     Plaintiff Heather Gettis joined the protest at the Liberty Bell. She marched alongside parents and their children as they made their way to Logan Square. Plaintiff Gettis observed the police kettling the protest march onto the Parkway. Once on 676 she, along with the hundreds of other protesters on 676, was attacked by the Defendant Jane/John Doe SWAT officers. Plaintiff Heather Gettis stated, "they herded us like cattle. They wanted to hurt us."  As she tried to escape, she was knocked over by the stampeding crowd that was fleeing the onslaught of tear

gas and rubber bullets fired by the Defendant Jane/John Doe SWAT officers. She was eventually able to fight her way up the hill and escape through a hole in the fence. Plaintiff Heather Gettis suffered a sprained neck, a sprained big toe, and psychological trauma.

231.   Plaintiff Ezra Ghizzone was protesting on 676 when the Defendant Jane/John Doe SWAT officers attacked with tear gas, rubber bullets and pepper spray. Plaintiff Ezra Ghizzone helped people over the fence to escape the tear gas, however, could not make it over. Plaintiff Ezra Ghizzone suffered tear gas inhalation, was falsely arrested, and was dragged down the hill by Defendant John Doe SWAT officer and place in zip ties.  Plaintiff Ghizzone was held for several hours and released after being issued a citation.

232.   Plaintiff Savannah Hamilton was protesting with her husband on 676 when the attack by Defendant Jane/John Doe SWAT officers began. As Plaintiff Savannah Hamilton made to the top of the hill through the cloud of tear gas, using excessive force, she was grabbed by her backpack and thrown to the ground by Defendant SWAT Officer John Doe. Plaintiff Savannah Hamilton was then grabbed by her hair and, again, pushed onto the ground. Plaintiff Savannah Hamilton was falsely arrested, zip tied, and held in custody for several hours. She was released after being issued a citation.

233.   Plaintiff Blake Hastings was protesting on 676 when the attack by the Defendant Jane/John Doe SWAT officers began. Plaintiff suffered gas inhalation while trying to escape the terrifying attack of tear gas and rubber bullets. Plaintiff Blake Hastings was falsely arrested and held for several hours before he was issued a citation and released. Plaintiff Blake Hastings recounts that the sense of panic he and others felt during the attack was "overwhelming."

234.   Plaintiff Samantha Heth joined the peaceful protest on 676. Once the Defendant Jane/John Doe SWAT officers initiated the attack, the peaceable march turned into a stampede as

protesters fled in panic from the tear gas and rubber bullets. Plaintiff Samantha Heth suffered tear gas inhalation and was falsely arrested by Defendant John Doe SWAT Officer. After she was held for several hours, Plaintiff Samantha Heth was issued a citation and released.

235.    Plaintiff Tsarina Islam was protesting on 676 when the attack initiated by Defendant Jane/john Doe SWAT officers began. As she attempted to reach the hill in order to escape the tear gas, Plaintiff Tsarina Islam recalled, "it hit me like a wave, as if I had tried to swallow twenty hot peppers at once. It hurt to breathe and stung my eyes." Plaintiff Tsarina Islam began choking, coughing up mucus, and thought she was "going to die." Plaintiff Tsarina Islam suffered physical, emotional, and psychological injury as the result of the actions and conduct of the Defendant Jane/Jon Doe SWAT officers.

236.    Plaintiff Ivan Juarez was protesting on 676 when the assault by the Defendant Jane/John Doe SWAT officers began. Plaintiff Ivan Juarez suffered tear gas inhalation and was falsely arrested by Defendant John Doe SWAT officer.  Plaintiff Ivan Juarez could not get over the fence to escape the tear gas attack because there were too many people packed up against the fence. Plaintiff Juarez was zip tied and forced to kneel on the pavement for a long period of time. Plaintiff Ivan Juarez was held in custody for several hours.  Plaintiff Ivan Juarez was released after he was issued a citation.

237.    Plaintiff Sophia Khan was protesting on 676 after the march was kettled toward the expressway by police. During the assault by the Defendant Jane/John Doe SWAT officers, she suffered tear gas inhalation. Plaintiff Sophia Khan was falsely arrested by Defendant Jane/John Doe SWAT officer and removed from the hill where she attempted to escape the attack. Plaintiff Sophia Khan was zipped tied, forced to remain in the highway for a long period of time, and then,

shuttled on a bus without masks. After being held for several hours, she was released after receiving a citation.

238.     Plaintiff Adam Knapp was protesting on 676 at the time the Defendant Jane/John Doe officers began their attack on the peaceful protest. Plaintiff Adam Knapp was near the front of the crowd when he observed the Defendant SWAT team officers enter the tunnel. As he went into the westbound lane, he was struck by a rubber bullet.

239.     Plaintiff Bernard Lambert was protesting on 676 at the time the Defendant Jane/John Doe officers began their attack on the peaceable protesters. Plaintiff Bernard Lambert ran to the hill to avoid the tear gas. Plaintiff Bernard Lambert, who suffers from asthma, suffered tear gas inhalation.

240.     Plaintiff Justine LeDonne was protesting on 676 at the time the Defendant Jane/John Doe officers began their attack on the peaceful protest. Plaintiff Justine LeDonne ran the hill to avoid the tear gas and was trapped on the hill as the tear gas enveloped the entire crowd. Plaintiff Justine LeDonne suffered tear gas inhalation. Knowing that she would not make it over the fence, she assisted others to escape the tear gas and rubber bullets. Plaintiff Justine LeDonne was falsely arrested by Defendant John Doe SWAT officer, zip tied, and place on the highway before being transported to the Police District. She was held for several hours and issued a citation before being released.

241.     Plaintiff Nathaniel Miller served as a Legal Observer for the march on June 1, 2020. Plaintiff Nathaniel Miller was on 676 when the assault by Defendant Jane/John SWAT officers began. Plaintiff Nathaniel Miller was struck by several rubber bullets fired by Defendant John Doe SWAT officers and suffered physical injuries as a result.

242.    Plaintiff Joseph Piette, a 73-year-old Vietnam Veteran, was on the Parkway protesting on June 1, 2020. Plaintiff Joseph Piette was standing on an overpass and looking down onto 676, taking photographs of the assault on the protesters. He was shot by a rubber bullet aimed at his head by Defendant John Doe SWAT officer. The rubber bullet struck his camera while he was taking photographs. The force of the rubber bullet smashed his camera into his head causing injury to his head and finger. Approximately a half hour later, while in the area of Spring Garden neighborhood, he was with three other people when Defendant Jane/John Doe Police officers pulled up onto the curb where the Plaintiff Joseph Piette was walking and Defendant John Doe Police Officer sprayed him with pepper spray. The Defendant John Doe Police Officer then pulled away. Plaintiff Joseph Piette suffered pain in his eyes, nose, and throat as the result of the pepper spray.

243.    Plaintiff Minh Tran was protesting on 676 on June 1, 2020 when the assault by the Defendant Jane/John Doe SWAT officers began. Plaintiff Minh Tran suffered tear gas inhalation and was falsely arrested by Defendant John Doe SWAT officer, as he could not get over the fence to escape the tear gas attack because there were too many people packed up against the fence. Plaintiff Minh Tran was zip tied forced to kneel on the pavement for a long period of time and held in custody for several hours.  Plaintiff Minh Tran was released after he was issued a citation.

244.    Plaintiff Robert Zolitor, a former United States Naval Communications Officer, was protesting on 676 on June 1, 2020, when the assault by the Defendant Jane/John Doe SWAT officers began. Plaintiff Robert Zolitor suffered tear gas inhalation and was grabbed while on the fence falsely arrested by Defendant John Doe SWAT officer. Defendant John Doe SWAT officer place zip ties on the Plaintiff.  After he was zip-tied, Plaintiff Robert Zolitor was forced to kneel on the pavement for a long period of time and held in custody for several hours. The zip ties were

so tight that they caused nerve damage to his hand.  Plaintiff Robert Zolitor was released after he was issued a citation.

245.    Plaintiff Brian McCaffrey was protesting on 676 when the attack from the Defendant Jane/John Doe SWAT team began. Plaintiff Brian McCaffery ran up the hill but there were dozens of people in front of him. Plaintiff Brian McCaffrey suffered gas inhalation while on the hill. He also suffered psychological injury as a result of the attack by the Defendants.

246.    Plaintiff Emily Quast was protesting on the Vine Street Expressway when the attack from the Defendant Jane/John Doe SWAT team began. Plaintiff Emily Quast suffered gas inhalation while on the hill. She eventually made it over the fence. However, while she was stuck in the cloud of tear gas, she thought she was going to die. She described the ordeal as the scariest experience of her life.

247.    Plaintiff Amber Wright was protesting on 676 when the attack from the Defendant Jane/John Doe SWAT team began. Plaintiff Amber Wright ran up the hill, but suffered gas inhalation before escaping through the fence. She also suffered psychological injury as a result of the attack by the Defendants.

248.    Plaintiff Megan Oehlbeck was protesting on 676 when the attack from the Defendant Jane/John Doe SWAT team began. Plaintiff Megan Oehlbeck ran up the hill, but there were dozens of people ahead. Plaintiff Megan Oehlbeck suffered gas inhalation while trying to escape. She observed National Guard or State Troopers throwing tear gas cannisters onto the highway. Finally, Plaintiff Megan Oehlbeck observed two Philadelphia Police helicopters flying low and dropping tear gas in the area of the protesters on 676.

249.    Plaintiff Sebastian Lopez was protesting on 676 when the attack from the Defendant Jane/John Doe SWAT team began. Plaintiff Sebastian Lopez suffered gas inhalation.

In addition, as the Plaintiff Sebastian Lopez was running away, he was hit with a rubber bullet before escaping over the wall. He also suffered psychological injury as a result of the attack by the Defendants.

250.   Plaintiff Andrew Powers was protesting on 676 at the time the Defendant Jane/John Doe SWAT officers began the assault. Plaintiff Andrew Powers ran to the hill as tear gas cannisters were launched into the crowd on the hill. Plaintiff Andrew Powers assisted other protesters in climbing over the fence. Plaintiff Andrew Powers stopped to help an elderly man. As the Defendant John Doe SWAT officers and State Troopers and/or National Guard soldiers approached the side of the hill, the Plaintiff Andrew Powers stepped in front of the elderly man to protect him from the rubber bullets. Just then one of the State Troopers or soldiers shot Plaintiff Andrew Powers with a rubber bullet striking him in the upper thigh. Plaintiff Andrew Powers fell backward from the force of the blow. He suffered with a limp for several days as a result of the injury. The Plaintiff also suffered tear gas inhalation and continues to suffer from the injury to his upper thigh.

251.   Plaintiff Kaitlyn Rafferty was protesting on 676 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. People began screaming as they ran toward the hill. The tear gas fired into the crowd by the Defendant Jane/John Doe SWAT officers covered the hill. Plaintiff Kaitlyn Rafferty suffered tear gas inhalation. While on the hill she witnessed people passing out and others shot with rubber bullets. Plaintiff Kaitlyn Rafferty was overwhelmed by the tear gas sat down on the hill. Defendant John Doe SWAT officer falsely arrested her, placed zip ties on her wrists and placed her on the ground. Plaintiff Kaitlyn Rafferty overheard the Defendant John Doe SWAT officers mock the protesters. Plaintiff Kaitlyn Rafferty was held for several hours and issued a citation before she was released.

252.     Plaintiff Jonathan Satlow was protesting on 676 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Jonathan Satlow, a veteran of the Israeli Army, observed Defendant SWAT officers fire tear gas cannisters into the crowd as he began to run up the hill to escape the assault. While he ran up the hill, he was shot in the back of the leg with a rubber bullet. Eventually, he was able to jump the fence. Plaintiff Jonathan Satlow suffered physical and psychological injury as a result of the attack.

253.     Plaintiff Mallory Schneider was protesting on 676 when the Defendant Jane/John Doe SWAT officers began the assault on the protesters. As the assault commenced and Plaintiff Mallory Schneider turned to flee, she felt a pain in her buttocks. She turned to look discovered that Defendant John Doe SWAT officer had shot her with a rubber bullet. Plaintiff Mallory Schneider crawled up the hill as it was covered in tear gas. As Plaintiff Mallory Schneider got up to run, she felt a searing pain in her knee as a tear gas cannister was launched by a Defendant John Doe SWAT officer striking her in the knee. Plaintiff Mallory Schneider continues to suffer physical and psychological pain.

254.     Plaintiff Erin Schenkenbach was protesting on 676 on June 1, 2020 when the attack by the Defendant Jane/John Doe SWAT officers began the assault. She suffered tear gas inhalation twice as the result of the Defendant Jane/John Doe SWAT officers launching tear gas cannisters into the crowd of protesters.

255.     Plaintiff Elias Sell was protesting on 676 on June 1, 2020 when the attack by the Defendant Jane/John Doe SWAT officers began the assault. As the result of the Defendant Jane/John Doe SWAT officers attack on the protesters, Plaintiff Elias Sell suffered tear gas inhalation on 676 and then again on the Parkway.

256.   Plaintiff Walter Smolarek was protesting on 676 at the time the Defendant Jane/John Doe officers began the attack on the protesters. Plaintiff Walter Smolarek suffered gas inhalation so severe that he could not breathe for several terrifying seconds.  Plaintiff Walter Smolarek could not see or breathe and thought he was going to die.

257.   Plaintiff Gwen Snyder was protesting on 676 with her husband Plaintiff Matthew Sullivan at the time the Defendant Jane/John Doe SWAT officers began the military assault on the peaceable protesters. While on the hill attempting to escape the tear gas, Plaintiff Matthew Sullivan was shot in the upper thigh by Defendant John Doe SWAT officer. Plaintiff Matthew Sullivan turned to face the Defendant John Doe SWAT officer. The Defendant John Doe SWAT officer stared back at Plaintiff Matthew Sullivan in an intimidating manner. Plaintiff Matthew Sullivan suffering extreme pain from the injury gave the Defendant John Doe SWAT officer "the middle finger." As he turned to leave, Defendant John Doe SWAT officer shot Plaintiff Matthew Sullivan in the back. Plaintiff Matthew Sullivan also suffered tear gas inhalation. Plaintiff Matthew Sullivan stills suffers from the two rubber bullet injuries. Plaintiff Gwen Snyder, Plaintiff' Matthew Sullivan's spouse, suffered tear gas inhalation as she escaped up the hill. Both Plaintiff Matthew Sullivan and Plaintiff Gwen Synder were both falsely arrested later in the day in the area of the Spring Garden area by Defendant Jane/John Doe Police officers.

258.   Plaintiff Sean Welch was protesting on 676 on June 1, 2020, at the time the Defendant Jane/John Doe SWAT officers began the military assault on the peaceable protesters. The Defendant Jane/John Doe SWAT officers began firing tear gas at the protesters, including Plaintiff Sean Welch. As he climbed up the hill, he suffered gas inhalation. As he was halfway up the hill, Defendant John Doe SWAT officer shot Plaintiff Sean Welch above his right elbow before he was able to escape over the fence.

259.    Plaintiff Callum Wilson was protesting on 676 on June 1, 2020 as the Defendant Jane/John Doe SWAT officers began their military assault on the protesters. Plaintiff Callum Wilson was standing on the highway when he observed two Defendant John Doe SWAT officers approaching as they started firing rubber bullets. Defendant John Doe SWAT officer shot a rubber bullet that struck Plaintiff Callum Wilson in the chest. Plaintiff Callum Wilson ran to the hill to escape the attack when he was overcome by the tear gas. While on the hill he suffered tear gas inhalation which caused him serious breathing problems as he has severe asthma. Plaintiff Callum Wilson, while choking on tear gas, was hit with a tear gas cannister launched by Defendant John Doe SWAT officer causing a bruise on his elbow.

260.    Plaintiff Seamus Wilson was protesting on 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Seamus Wilson was shot with a tear gas cannister by Defendant John Doe SWAT officer while trying to escape the tear gas and rubber bullets. The tear gas cannister fired at Plaintiff Seamus Wilson by Defendant John Doe SWAT officer struck his forearm causing a fracture.

261.    Plaintiff Christopher McDaniel was protesting on 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Christopher McDaniel was on the hill trying to avoid the tear gas fired into the crowd when he was shot with a tear gas cannister by Defendant John Doe SWAT officer while trying to escape the tear gas and rubber bullets. The tear gas cannister fired by Defendant John Doe SWAT officer struck Plaintiff Christopher McDaniel in the head, which caused serious bodily injury as blood vessel in his eye burst. Plaintiff Christopher McDaniel continues to suffer physical and psychological injury as the result of being the struck in the head with a tear gas cannister. Plaintiff Christopher McDaniel also suffered from the impact of inhaling the tear gas.

262.    Plaintiff Jacob Parente was protesting on 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Jacob Parente retreated to the hill with the crowd of protesters trying to escape the tear gas and rubber bullets. Plaintiff Jacob Parente described the chaotic scene as "a war zone." When Plaintiff Jacob Parente got to the top of the hill, he helped others over and, then, scaled the fence. After he scaled the fence, he was shot in the back with rubber bullets through the fence at point blank range. Plaintiff Jacob Parente turned back and observed either a Defendant John Doe SWAT officer or a Pennsylvania State Trooper looking at him only feet away holding a gun in his hand. It was that Defendant John Doe SWAT officer or Pennsylvania State Trooper who shot him in the back with rubber bullets. Plaintiff Jacob Parente also suffered gas inhalation while he was on the hill. He continues to suffer physical pain and psychological injury as the result of assault.

263.    Plaintiff Jamila Hankinson along with her family, Plaintiff Alessandra Hankinson, Plaintiff Susan Hankinson, and Plaintiff Ahmad Hankinson were all marching on June 1, 2020. While on the parkway Jamil Hankinson, a community organizer for twenty-five years, sat down near the Free Library as she was overcome by emotion from all the love and support she felt was coming from this extraordinary crowd protesting for racial justice. Plaintiff Jamila Hankinson, along with Plaintiffs Alessandra Hankinson, Susan Hankinson, and Ahmad Hankinson heard loud bangs and ran over to look down onto 676. As the Plaintiffs were observing the assault by the police on the protesters on 676 tear gas was launched into the crowd where they were standing on the Parkway. Plaintiff Jamila Hankinson described a low flying police helicopter using loud noise to try and disperse the crowd. Plaintiff Jamila Hankinson, Plaintiff Alessandra Hankinson, Plaintiff Susan Hankinson, and Plaintiff Ahmad Hankinson tried to assist protesters on 676 try to get over the fence and once they were over the fence. However, they were stopped by the clouds of tear gas

coming in all directions.  All of the Hankinson Plaintiffs suffered tear gas inhalation from the Defendant Jane/Jon Doe SWAT officers launching tear gas cannisters into the crowd on the Parkway.

264.    Plaintiff Joseph Koehler was protesting on 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Joseph Koehler initially took a knee on the highway after he observed a protester next to him get shot with rubber bullets. Once he realized that the Defendant Jane/John Doe SWAT officers were not going to stop attacking, he fled to the hill in an effort to escape the tear gas and rubber bullets. Plaintiff Joseph Koehler struggled to breathe as the cloud of tear gas covered the entire hill. The Defendant SWAT officers continued to fire tear gas cannisters into the crowd on the hill. Plaintiff Koehler was injured as he made his escape over the fence.

265.    Plaintiff Bryan Ortiz was protesting on 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Bryan Ortiz suffered tear gas inhalation as he made his way up the hill. Defendant Jane/John Doe SWAT officers continued to fire tear gas cannisters into the crowd on the hill where Plaintiff Bryan Ortiz was trapped. Eventually, Plaintiff Bryan Ortiz made it over the fence.

266.    Plaintiff Gabrielle Eisenhower was protesting on the overpass to 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Gabrielle Eisenhower remained on the overpass and suffered tear gas inhalation. She continues to suffer psychological injury as a result.

267.    Plaintiff Cea Fortarezzo Ortiz was protesting on 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. As soon as the Jane/John Doe SWAT officers began to launch tear gas cannisters into the crowd, Plaintiff Cea

Fortarezzo, who has asthma, inhaled the tear gas. The crowd almost trampled her. Plaintiff Cea Fortarezzo broke out in hives immediately after she was engulfed in tear gas. She continues to suffer psychological injury from the attack.

268.    Plaintiff Bradford Pulley was protesting on the overpass to 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. As soon as the attack began, Plaintiff Bradford Pulley tried to escape over the median strip he was pushed by the panicked crowed trying to escape the assault. The pushing causing him to fall over onto the highway and break his foot. He was dragged by his friends up the hill while the Defendant Jane/John Doe SWAT officers fired tear gas cannisters into the crowd. Plaintiff Brad Pulley suffered tear gas inhalation while he was dragged up the hill through the cloud of tear gas.

269.    Plaintiff Skylar Watkins was protesting on the overpass to 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. When Jane/John Doe SWAT officers began launching tear gas and firing rubber bullets into the crowd of protesters, Plaintiff Skylar Watkins ran up the hill to escape. Unable to pull herself over the hill, she stumbled back down the hill, suffering from gas inhalation. Eventually, a woman in a vehicle on 676 allowed her into her vehicle enabling Plaintiff Skylar Watkins to escape.

270.    Plaintiff Taylor Brown was protesting on the overpass to 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Taylor Brown witnessed a police vehicle pull up on the highway in front of several protesters. All of the protesters knelt down in front of the police vehicle. All of a sudden, the tear gas attack began. People were trampled as they ran from the tear gas. Plaintiff Taylor Brown could not see from the cloud of tear gas and was trampled by the crowd trying to escape. As she got up and ran to the top of the hill, she was struck by a rubber bullet or tear gas cannister on her right arm fired by

Defendant Jane/John Doe SWAT officer. Her camera was broken as she fell from the shot. Eventually, she was able to get over the fence. She still suffers physical and psychological injury.

271.    Plaintiff Shannon Roche was protesting on the overpass to 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Once the attack began, the crowd stampeded toward the Plaintiff Shannon Roche. She suffered tear gas inhalation as the result of the assault by Defendant Jane/John Doe SWAT officers.

272.    Plaintiff Joshua Walker was protesting on the overpass to 676 on June 1, 2020 at the time the Defendant Jane/John Doe SWAT officers began the attack on the protesters. Plaintiff Joshua Walker ran to the hill helping others as they struggled to escape the attack. He was eventually able to climb the fence after helping others to escape. Plaintiff Joshua Walker has asthma and suffered tear gas inhalation. He suffered from severe respiratory problems for days after the attack.

273.    Plaintiff Miller was one of the demonstrators trapped on the embankment fleeing the tear gas and ostensible "less-lethal" munitions. Plaintiff Miller, after having already been sprayed directly in the face with tear gas by defendant Nicoletti, was engulfed in tear gas and white smoke further inhibiting her ability to breathe or see. She was only able to escape the attack by PPD by being lifted over the fence by fellow protesters at the top of the hill, suffering additional injuries as she fell to the ground while attempting to escape further serious attacks by police.

274.    Plaintiff Sorenson was one of the demonstrators trapped on the embankment fleeing the tear gas and "non-lethal" munitions. Plaintiff Sorenson, after having already been sprayed directly in the face with tear gas by defendant Nicoletti, was engulfed in tear gas and white smoke further inhibiting her ability to breathe or see. She was only able to escape the attack by PPD by

being lifted over the fence by fellow protesters at the top of the hill, suffering additional injuries as she fell to the ground while attempting to escape further serious attacks by police

275.    Plaintiff Hibbard was on the Vine Street Expressway with Plaintiff Sorenson and was exposed to tear gas when Defendant Nicoletti sprayed Plaintiffs Hough, Miller, and Sorenson. Hibbard was also one of the demonstrators trapped on the embankment fleeing the tear gas and ostensible "non-lethal" munitions. He was only able to escape the attack by Philadelphia police officers by being lifted over the fence by fellow protesters at the top of the hill, suffering additional injuries as he fell to the ground while attempting to escape further serious attacks by police.

276.    Plaintiff Christopher Romano was with his wife Kelsey Romano and was one of the demonstrators trapped on the embankment fleeing the tear gas and ostensible "non-lethal" munitions. While waiting to climb the fence at the top of the embankment, Christopher felt a rubber bullet graze his hand. Tear gas canisters landed directly at Christopher's feet while he was standing on the embankment forcing him to inhale the gas. Christopher began to vomit due to the amount of gas he inhaled. He was only able to escape the attack by PPD by being lifted over the fence by fellow protesters at the top of the hill, suffering additional injuries as he fell to the ground while attempting to escape further serious attacks by police.

277.    Plaintiff Ilshim Pearlman was one of the demonstrators trapped on the embankment fleeing the tear gas and ostensible "non-lethal" munitions. Pearlman was struck in the back of his leg as he was scrambling up the embankment attempting to escape the attack of PPD.  He was only able to escape the attack by PPD on the hill by being lifted over the fence by fellow protesters at the top of the hill, suffering additional injuries as he fell to the ground while attempting to escape further serious attacks by police.  Once on the other side of the fence, Pearlman tried to help others escape the assaults.  As he attempted to help others over the fence, an officer trying to arrest a

protester on the hill a few feet away shot Pearlman through the fence and in his stomach with a rubber bullet. The rubber bullet was so forceful that it caused a large hematoma on Pearlman's stomach. PPD officers fired tear gas canisters and rubber bullets from close range at Pearlman and the other demonstrators the entire time they were on the embankment.

278.    Officers also began to fire tear gas canisters at people who had left the highway, directing those canisters at onlookers standing on the North 21st Street overpass.

279.    With hundreds of demonstrators remained pinned in place on the hill and having no ability to leave, officers in full body armor began to climb the hill and take them into custody. Officers violently grabbed demonstrators, dragged them down the hill, and, once at highway level, placed them in zip-tie handcuffs.

280.    Plaintiff Kelsey Romano was with her husband Christopher Romano. She was one of the demonstrators trapped on the embankment, fleeing the tear gas and ostensible "non-lethal" munitions. While waiting to climb the fence at the top of the embankment, Kelsey was struck multiple times in her back with rubber bullets. An officer outfitted in riot gear took Kelsey into custody on the hill and zip-tied her hands behind her back. The officer then grabbed Kelsey by her zip-tied wrists and pulled her, causing her to fall.  Because her hands were bound, she was unable to brace herself against hitting the ground.  The officer then literally dragged Kelsey on her back and backwards down the embankment. A news helicopter operated by NBC 10 Philadelphia captured Kelsey being dragged down the embankment by the officer.

281.    Demonstrators taken into custody were forced to sit on the highway in close proximity to each other in the midst of tear gas. Even after protesters were taken into custody, tear gas canisters continued to be launched onto the hill by officers.  Some canisters hit the hill and

rolled down into the faces of the detained protesters.  With nowhere to go, the protesters were forced to inhale the gas directly.

282.     The protesters were later placed onto buses and taken to a variety of police districts. There they were given citations for "failure to disperse" in violation of Philadelphia City Code 10-1603(2). These citations have no legal basis as each person who received a citation had attempted to "disperse" but was prevented from doing so by the officers' conduct.

283.     At no time during the demonstration was any of the force used by law enforcement officers justified or proportional. On the contrary, all force used was unprovoked, unjustified, extreme, and unlawful.

## F.     City Policymakers' Shifting Justifications for the Police Use of Force on the Vine Street Expressway

284.     In the immediate aftermath of the police action on the Vine Street Expressway, Commissioner Outlaw asserted that the use of tear gas and ostensible less-lethal munitions was an appropriate and proportionate response to the demonstration.

285.     In a statement issued late the night of June 1, Commissioner Outlaw said protesters "surrounded a State Trooper, who was alone and seated in his vehicle, and began rocking the vehicle, with the trooper having no safe means of egress."[17]

286.     Commissioner Outlaw also stated on June 1, 2020 that people in the "crowd began throwing rocks at the officers from the north and south sides, and from the bridges above the officers. The crowd also began rushing toward the officers."[18]

---

[17] Chris Palmer & Ellie Rushing, *Philly Police Commissioner Danielle Outlaw, Mayor Jim Kenney apologize for teargassing of protesters on 676*, The Philadelphia Inquirer (June 25, 2020), *available at*, https://www.inquirer.com/news/philadelphia-protests-676-teargas-mayor-jim-kenney-danielle-outlaw-20200625.html.

[18] *Id.*

287.     Mayor Kenney also claimed that the police action was appropriate, stating through an official spokesperson on the night of June 1, 2020 that the information about protesters throwing rocks came from firsthand accounts of high-ranking police commanders who witnessed the incident.[19]

288.     The next day, June 2, 2020, Commissioner Outlaw issued a memorandum to all officers in the PPD.  In that memorandum, Commissioner Outlaw acknowledged that the force used on the Vine Street Expressway was a result of a deliberate decision by the City's policymakers.  Commissioner Outlaw wrote: "The City's decision to deploy less than lethal munitions was deliberate and deemed necessary for safety for both officers and those protesters who swarmed the interstate highway."[20]

289.     In the days that followed, members of the public, demonstrators who were present in West Philadelphia and on the Vine Street Expressway, Philadelphia City Councilmembers, and the media questioned City officials as to whether there was any evidence to support their assertions that the use of force was justified.

290.     Hundreds of demonstrators and local journalists posted videos on various social media platforms.  None of the videos posted displayed any evidence of violence whatsoever or any other circumstances that would have justified the extreme use of force, including tear gas, pepper spray, or ostensible less-than-lethal munitions.[21]

---

[19] *Id.*

[20] *See* Max Marin & Ryan Briggs, *Philly police commissioner alters use of force policy after tear gas, warns about press arrests*, WHYY (June 2, 2020), *available at*, https://whyy.org/articles/philly-police-commissioner-alters-use-of-force-policy-after-tear-gas-warns-about-press-arrests/.

[21] Ryan Briggs & Max Marin, *Philly police say tear gas used because 676 protest turned hostile, but there's no evidence that happened*, WHYY (June 2, 2020), *available at*, https://whyy.org/articles/philly-police-say-tear-gas-used-because-676-protest-turned-hostile-but-theres-no-evidence-that-happened/.

291.    Despite the absence of evidence to support their claimed justifications for the extreme use of force, City officials refused to retract or reconsider their statements of June 1, 2020. Instead, City policymakers provided shifting explanations for how the decision to use tear gas was made.

292.    In a City Council budget hearing on June 10, 2020, City Managing Director Brian Abernathy stated that City policymakers had, on May 31, 2020, given broad authorization for police to use tear gas.  The decision was made, according to Managing Director Abernathy, by the City's unified command group. Commissioner Outlaw stated in the same budget hearing that the decision to use tear gas was left to the "commander on the ground." At no time in the hearing did Managing Director Abernathy or Commissioner Outlaw acknowledge that the use of force on the Vine Street Expressway was improper.  On the contrary, Managing Director Abernathy expressly declined an invitation from City Councilmember Helen Gym to disavow the future use of tear gas and rubber bullets.[22]

293.    Five days later, facing criticism from reports that the City had given broad authorization for the use of tear gas, Mayor Kenney and Commissioner Outlaw issued a statement announcing an independent investigation into police actions against protesters in the city.  Mayor Kenney, departing from Managing Director Abernathy's assertion, stated: "We did not, and would never, pre-authorize or give police officers free rein to use any type of force against peaceful protesters exercising their constitutional rights."   Mayor Kenney mentioned the Vine Street Expressway by name (calling it "the incident on I-676") but neither he nor Commissioner Outlaw

---

[22] Laura McCrystal, *Mayor Jim Kenney approved tear gas use at Philly protests, officials say as City Council questions police response*, The Philadelphia Inquirer (June 10, 2020), *available at*, https://www.inquirer.com/news/tear-gas-protests-philadelphia-police-budget-20200610.html.

mentioned the police violence against residents and protesters in West Philadelphia.  Additionally, nowhere in the statement did Mayor Kenney or Commissioner Outlaw acknowledge that the use of force in West Philadelphia and on the Vine Street Expressway was improper.[23]

294.    By June 23, 2020, no City official had retracted the assertion that the use of tear gas on the Vine Street Expressway was justified by the danger posed to a Pennsylvania State Police trooper stranded alone in a police vehicle in the midst of the demonstration.

295.    On that date, the State Police released several hours of dashcam video and audio footage from the vehicle at issue.  The video showed that the trooper had stopped his vehicle in traffic after demonstrators entered the highway and that the trooper was able to safely and easily leave the vehicle.  As protesters walked past the vehicle, a person broadcasting on police radio can be heard stating: "All traffic is stopped.  Repeat, they're 'peaceful,' just walking eastbound."  In short, the dashcam video confirmed that the initial representations used to justify the extreme use of force were completely false.[24]

296.    Two days later, on June 25, 2020, The New York Times published its comprehensive video compilation of events on the Vine Street Expressway, reaching two important conclusions: the demonstration on the highway was not violent and the force used by police was excessive and unjustified.[25]

---

[23] City of Philadelphia, *Mayor Kenney and Police Commissioner Outlaw Announce Plans for Independent After-Action Investigation of City's Response to Recent Protests* (June 15, 2020), *available at*, https://www.phila.gov/2020-06-15-mayor-kenney-and-police-commissioner-outlaw-announce-plans-for-independent-after-action-investigation-of-citys-response-to-recent-protests/.

[24] Ryan Briggs, *'They're peaceful': Pa. State Police release dashcam video from I-676 protest tear-gassing*, WHYY (June 23, 2020), *available at*, https://whyy.org/articles/theyre-peaceful-pa-state-police-release-dashcam-video-from-i-676-protest-tear-gassing/.

[25] *See supra* note 1.

297.    That afternoon, Mayor Kenney and Commissioner Outlaw conducted their press conference in which they both apologized for the excessive use of force against peaceful demonstrators and acknowledged the need for accountability.[26]

298.    While conceding at the press conference that police had used excessive force and despite discussing concepts of accountability, Commissioner Outlaw claimed—for the first time since the June 1 event—that the decision to use tear gas had rested exclusively in the hands of Deputy Commissioner Dennis Wilson who was, according to Commissioner Outlaw, the "incident commander" on the Vine Street Expressway.  Wilson was, as Commissioner Outlaw publicly stated, "falling on the sword."  Wilson appeared at the press conference to personally announce that he would be taking a voluntary demotion.[27]

299.    At no time during the press conference in which she cast responsibility on Deputy Commissioner Wilson did Commissioner Outlaw explain why her first description of the incident on June 2, 2020 had identified the decision as a "deliberate" one made by "the City."[28]

300.    Additionally, Mayor Kenney and Commissioner Outlaw once again failed to address the police violence against residents and protesters in West Philadelphia, just as they failed to do in their June 15, 2020 statement.

**G.      The City's Violations of Plaintiffs' Constitutional Rights and Plaintiffs' Harms and Losses**

---

[26] Max Marin & Ryan Briggs, *Kenney, Outlaw admit they were wrong about 676 protest tear-gassing, officers involved to be fired*, WHYY (June 25, 2020), *available at*, https://whyy.org/articles/kenney-outlaw-admit-they-were-wrong-about-676-protest-tear-gassing-officers-involved-to-be-fired/.

[27] *Id.*

[28] *See supra*

Each of the Plaintiffs in this action was subjected to the above-described conduct as follows:

301.    The actions of the City of Philadelphia and defendants Jane/John  Does 1-100 violated all Plaintiffs' constitutional rights in at least two respects: (1) they violated the rights of Plaintiffs to be free from the excessive use of force under the Fourth and Fourteenth Amendments to the U.S. Constitution, and (2) they retaliated against Plaintiffs' exercise of free speech in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution.

302.    For each Plaintiff who was detained, taken into custody, and issued a citation, the City of Philadelphia and Defendants John Does 1-100 violated Plaintiffs' right to be free from an unlawful seizure without sufficient legal cause in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

303.    At all times, the conduct of Defendants John Does 1-100 was with deliberate indifference, that is with willful, reckless, and callous disregard of plaintiffs' clearly established rights under federal and state law.

304.    All of the unconstitutional actions described above were the result of specific decisions and/or authorization made on the part of policymakers for the City of Philadelphia, and, as such, the City is responsible for the violation of plaintiffs' constitutional rights.

305.    To the extent that any of the above unconstitutional actions were not decided or authorized by City policymakers, all such actions were the result of decisions by City policymakers to delegate such decision-making authority to the persons who did authorize and/or direct the unconstitutional conduct.

306.    To the extent that any of the individual John Doe defendants acted outside the authorization and direction of City policymakers or the persons to whom policymaking authority

was delegated, the City is responsible for failing to properly train, supervise, and/or discipline the officers who so acted. Given the City's known history of improper and excessive response to peaceful protest activity, the City's failures in this regard were with deliberate indifference to the risk of constitutional violations.

307. As a direct and proximate cause of the named Defendants' and the Defendant Jane/John Doe Defendant Police Officers, as well as the City of Philadelphia, each individual Plaintiff suffered physical and psychological injury, emotional distress, pain and suffering, as well as financial loss which will be established at trial.

## VI.    CAUSES OF ACTION

### COUNT I
### PLAINTIFFS V. DEFENDANT NICOLETTI
### AND DEFENDANTS JANE/JOHN DOES 1-100
### VIOLATION OF FOURTH AMENDMENT:
### EXCESSIVE USE OF FORCE

308. Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.

309. The named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, with deliberate indifference, while acting under the color of state law, and without legal justification, engaged in excessive and unreasonable force employing various weapons and methods against the Plaintiffs on May 31, 2020 and June 1, 2020 engaged in lawful protest. The use of excessive force included, but was not limited to, the use of pepper spray, in violation of Philadelphia Police Directive 10, the use of tear gas, rubber bullets, flash grenades, zip ties, low flying helicopters, armored vehicles, metal asps, physical assaults, and other such methods designed to cause harm to the Plaintiffs.

310.    As a direct and proximate cause of the actions and conduct of the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, the Plaintiffs suffered and continue to suffer physical, emotional, and psychological injury, some of which may be permanent.

311.    The named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, with deliberate indifference and acting under the color of state law, violated the Plaintiffs' rights to be free from the use of excessive and unreasonable force as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. Section 1983.

## COUNT II
## PLAINTIFFS V. DEFENDANTS
## FIRST AMENDMENT RIGHT TO FREE SPEECH

312.    Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.

313.    The Plaintiffs claim damages for the violation of their rights to free speech, association, and assembly under the First Amendment of the United States Constitution, as well as the Pennsylvania Constitution.

314.    On May 31, 2020 and June 1, 2020, the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers unlawfully and without legal justification, while acting under the color of state law, deprived the all of the above named Plaintiffs' rights to free speech, association, and assembly as protected by the First and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. Section 1983.

315.    The named Defendants, as well as Defendant Jane/John Doe Police Supervisors and Officers, by their actions and conduct on May 31, 2020 and June 1, 2020 in terminating the Black Lives Matter protest marches seeking racial justice in the City of Philadelphia for all the Plaintiffs with the use of excessive and unreasonable force, and for some for some of the Plaintiffs,

by falsely arresting the Plaintiffs for exercising their rights under the First Amendment, violated their individual rights to free expression, to association, and assembly.

316.    The actions and conduct of the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers in terminating the protests marches on May 31, 2020 and June 1, 2020, violated the rights of all of the named Plaintiffs to continue to engage in their First Amendment rights during the marches for racial justice on both of above mentioned dates, and acted with deliberate indifference toward the Plaintiffs' individual First Amendment rights.  For some of the Plaintiffs the actions and conduct by the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, had a chilling effect on their individual right to rights to free speech, association and assembly under the First Amendment.

317.    As a direct and proximate cause of the named Defendants' actions and conduct, as well as the actions and conduct of Defendant Jane/John Doe Police Supervisors and Officers, the Plaintiffs suffered a deprivation of their First Amendment rights to continue to engage in free speech, association and assembly on May 31, 2020 and June 1, 2020, and for some of the Plaintiffs created a chilling effect on the exercise of their First Amendment rights in the future.

318.    As a direct and proximate cause of the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, unlawful and unconstitutional actions and conduct, all of the Plaintiffs suffered emotional distress, pain, and suffering. Some Plaintiffs suffered physical pain and suffering as well as financial loss, which will be established at trial.

**COUNT III**
**PLAINTIFFS V. DEFENDANTS**
**RETALIATION AGAINST FREE EXPRESSION**

319.    Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.

320.    All defendants caused the unlawful retaliation against plaintiffs' free expression and speech in violation of plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT IV**
**PLAINTIFFS V. DEFENDANTS JANE/JOHN DOES 1-100**
**VIOLATION OF FOURTH AMENDMENT: FALSE ARREST**
**AND UNLAWFUL DETENTION**
**(42 U.S.C. SECTION 1983)**

321.    Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.

322.    Defendants caused the unlawful seizure of plaintiffs who were arrested when they detained them without sufficient legal cause for an alleged failure to disperse.

323.    At no time during the protest marches on May 31, 2020 and June 1, 2020 did the Plaintiffs commit any offense against the laws of the Commonwealth of Pennsylvania or United States to justify a lawful seizure under the Fourth Amendment of the United States Constitution. The named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, with deliberate indifference, while acting under the color of state law, and without reasonable suspicion or probable cause or legal justification, falsely arrested and subsequently detained many of the Plaintiffs, and/or attempted to arrest the Plaintiffs in violation of their individual rights under the Fourth and Fourteenth Amendments to the United States Constitution, as well as Section 42 U.S.C. Section 1983.

**COUNT V**
**PLAINTIFFS V. DEFENDANTS**
**CONSPRIACY TO VIOLATE**
**FIRST AND FOURTH AMENDMENT RIGHTS**

324.    Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.

325.     The named Defendants, as well as Defendant Jane/John Doe Police Supervisors and Officers, agreed among themselves, as well as jointly and in concert with the Pennsylvania State Police, and the Pennsylvania National Guard, and without legal justification regarding the Plaintiffs' First Amendment rights and without reasonable suspicion or probable cause regarding the Plaintiffs' Fourth Amendment rights, to violate those individual rights on May 31, 2020 and June 1, 2020. The named Defendants, as well the Defendant Jane/John Doe Police Supervisors and Officers, while acting under the color of state law and with deliberate indifference, acted jointly and in concert with each other, as well as with the Pennsylvania State Police and the Pennsylvania National Guard, conspired to interfere, terminate and/or deprive the Plaintiffs' of their First Amendment rights to speech, association and assembly.

326.     In addition to the above, the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, while acting under the color of state law and with deliberate indifference, engaged in an agreement among themselves and with the Pennsylvania State Police, Pennsylvania National Guard, to act jointly and in concert and conspiracy with each other to retaliate against the Plaintiffs for exercising their First Amendment rights to free speech, association and assembly on May 31, 2020 and June 1, 2020.

327.     The named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, while acting under the color of state law and with deliberate indifference, acted jointly and in concert with federal law enforcement, including the FBI to chill the First Amendment rights of many of the Plaintiffs by permitting the FBI access to the Philadelphia Police Department facilities in order to subject those Plaintiffs arrested and detained by Philadelphia Police to interrogation by the FBI regarding their lawful protest activities in violation of their First Amendment rights.

328.    The named Defendants, as well as the Defendant Jane/John Doe Supervisors and Officers, while acting under the color of state law and with deliberate indifference, acted jointly and in concert and conspiracy among themselves and with the Pennsylvania State Police and Pennsylvania National Guard to violate the Fourth Amendment rights of the Plaintiffs to falsely arrest and detain, or attempt to falsely arrest and detain the Plaintiffs and to engage in excessive and unreasonable force.

329.    As a direct and proximate cause of the joint and concerted action and conspiracy by the named Defendants, the Defendant Jane/John Doe Police Supervisors and Officers, as well as the Pennsylvania State Police and Pennsylvania National Guard, the Plaintiffs' suffered physical, emotional and psychological injury and financial loss, some of which may be permanent.

330.    The above asserted agreement, joint and concerted action and conspiracy by the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, the Plaintiffs' rights were violated under the First, Fourth and Fourteenth Amendments to the United States Constitution were violated, as well as 42 U.S.C. Section 1983.

### COUNT VI
### PLAINTIFFS V. DEFENDANTS CITY OF PHILADELPHIA, KENNEY, OUTLAW, AND WILSON FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE PURUSANT TO 42 U.S.C. SECTION 1983

331.    Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.

332.    Prior to May 30, and June 1, 2020, the City of Philadelphia, and the policy makers within the Philadelphia Police Department, including Defendants Mayor Kenney, Police Commissioner Outlaw as a policy maker, and former Deputy Commissioner Wilson, developed and maintained policies and/or customs and practices exhibiting deliberate indifference to the

constitutional rights of individuals engaged in protests, policies and/or customs and practices that caused the violation of Plaintiffs' rights in the instant case.

333.    Defendants, as a matter of policy and custom and/or practice has with deliberate indifference, failed to adequately and properly investigate claims that police had used excessive force and wrongfully arrested individuals engaged in lawful protests. This policy has been in place for years and was the direct cause of the Plaintiffs' harm in this case, all of whom were either engaged in a peaceful protest or bystanders lawfully observing the peaceful protest. This policy and custom and/or practice caused the named Defendants, as well as the Defendant Jane/John Doe Philadelphia Police Supervisors and Officers in this case to engage in the unlawful, unconstitutional conduct as described in detail in this complaint, including violating the First and Fourth Amendment rights of protesters, and retaliating against protesters for exercising their rights under the First Amendment.

334.    Defendants, as a matter of policy and custom and/or practice has with deliberate indifference, failed to adequately and properly supervise and train police officers, including the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers in this case, regarding the constitutional rights of protestors to engage in free speech activities, as well as be free from excessive use of force and unlawful arrest, thereby adequately and properly discourage further constitutional violations against protestors and others by police Supervisors and Police Officers. The City of Philadelphia does not require adequate and proper in-service training of the Philadelphia Police Officers, and does not provide for adequate and proper retraining of its officers who were known to have engaged in violating the rights of protesters to exercise their First Amendment rights and to be free from excessive use of force and false arrests of protestors and others, protected by the First Amendment. The failure to adequately and properly train the named

Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers in this case, caused the all of the Defendants to engage in the unlawful and unconstitutional conduct as described above.

335.    Defendants, as a matter of policy and custom and/or practice has with deliberate indifference, failed to adequately and properly discipline and sanction police officers, including the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers in this case, for violating the constitutional rights of protestors, thereby failing to adequately and properly discourage further constitutional violations on the part of its police officers. The City of Philadelphia failed to discipline and sanction those Police Supervisors and Officers engaged in conduct which violated the First Amendment rights of protestors, thereby causing and encouraging police, including the named Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, to engage in the unlawful and unconstitutional conduct described above.

336.    As a result of the above-described policies, customs, and/or practices, Defendants, as well as the Defendant Jane/John Doe Police Supervisors and Officers, believe their actions and conduct would be sanctioned, or not properly monitored by Police Supervisors and that their misconduct would therefore not be investigated, but rather would be encouraged and/or tolerated.

337.    The above-described policies and customs and/or practices demonstrate a deliberate indifference on the part of the policymakers for the City of Philadelphia Police Department, to the constitutional rights, specifically the First, Fourth and Fourteenth Amendments of the United States Constitution, of those engaged in protests and therefore, caused the violation of Plaintiffs' rights alleged in this complaint.

338.    As a direct and proximate cause of the unlawful and unconstitutional actions and conduct engaged in by the named Defendants, the Defendant Jane/John Doe Police Supervisors

and Officers, as well as the Defendant City of Philadelphia, each individual Plaintiff suffered physical and psychological injury, emotional distress, pain and suffering, and for some if not all, financial loss which will be established at trial.

### COUNT VII
### ASSAULT
### PLAINTIFFS VS. DEFENDANT NICOLETTI
### AND DEFENDANT JANE/JOHN DOE 1-100

339.  The allegations set forth in the preceding paragraphs are incorporated as though fully set forth herein.

340.  Defendants intended to and actually placed Plaintiffs in fear of imminent, unwarranted, unprivileged, offensive bodily contact.

341.  As a consequence of these actions, Plaintiffs suffered bodily injury.

342.  The acts of Defendants, as set forth above, constituted the tort of assault, all to Plaintiffs' great detriment and loss.

### COUNT VIII
### BATTERY
### PLAINTIFFS VS. DEFENDANT NICOLETTI
### AND DEFENDANT JANE/JOHN DOE 1-100

343.  The allegations set forth in the preceding paragraphs are incorporated as though fully set forth herein.

344.  Defendants intended to subject Plaintiffs to harmful offensive bodily contact and did, in fact, subject them to such bodily contact.

345.  As a consequence of these actions, Plaintiffs suffered bodily injury.

346.  The acts of Defendants, as set forth above, constituted the tort of battery, all to Plaintiffs' great detriment and loss.

### COUNT IX
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## PLAINTIFFS VS. DEFENDANT NICOLETTI
## AND DEFENDANT JANE/JOHN DOE 1-100

347.    The allegations set forth in the preceding paragraphs are incorporated as though fully set forth herein.

348.    Defendants intentionally, recklessly, willfully, and without legal justification, by extreme and outrageous conduct caused severe emotional distress to Plaintiffs.

349.    The acts of Defendants alleged in the preceding paragraphs constitute the tort of intentional infliction of emotional distress outrageous conduct all to Plaintiffs great detriment and loss.

**WHEREFORE**, Plaintiffs respectfully request:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to all named Defendants as well as Jane/John Does 1-100;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiffs hereby demands a jury trial.

MINCEY FITZPATRICK ROSS, LLC.
2 Penn Center
1500 JFK Blvd, Suite 1525
Philadelphia, PA  19102
215-587-0006 (Phone)
215-587-0628 (Fax)

/s/ Riley H. Ross III
Riley H. Ross III
ID No. 204676
riley@minceyfitzross.com

/s/ Kevin V. Mincey
Kevin V. Mincey
ID No. 90201
kevin@minceyfitzross.com

/s/ Thomas O. Fitzpatrick
Thomas O. Fitzpatrick
ID No. 93204
tom@minceyfitzross.com

/s/ Shabrei M. Parker
Shabrei M. Parker
ID No. 309005
shabrei@minceyfitzross.com

*Counsel for Plaintiffs*

MICHAEL COARD, ESQ.
BNY Mellon Center
1735 Market Street, Suite 3750
Philadelphia, PA 19103
(215) 552-8714 (Phone)
(215) 552-8525 (Fax)

/s/ Michael Coard
Michael Coard
ID No. 47344
michaelcoardx@gmail.com

*Counsel for Plaintiffs*

PAUL J. HETZNECKER, ESQ.
1420 Walnut Street, Suite 911
Philadelphia, PA 19102
(215) 893-9640 (Phone)
(219) 893-0255 (Fax)

/s/ Paul J. Hetznecker
Paul J. Hetznecker
ID No. 49990
phetznecker@aol.com

*Counsel for Plaintiffs*

LAW OFFICES OF M.J. SNYDER, LLC.
Land Title Building
100 S Broad Street, Suite 1910
Philadelphia, PA 19102
215-515-3360 (Phone)
215-376-6981 (Fax)

/s/ Marni Jo Snyder
Marni Jo Snyder
ID No. 204377
marni@snyderlawyer.com

/s/ Stephen D. Stewart Jr.
Stephen D. Stewart Jr.
ID No. 316104
ss@stephenstewartlaw.com

*Counsel for Plaintiffs*